**LURIA BROTHERS & CO., INC.,
Plaintiff-Appellee,**

v.

**PIELET BROTHERS SCRAP IRON &
METAL, INC., Defendant-Appellant.**

**No. 77-1529.**

United States Court of Appeals,
Seventh Circuit.

Argued April 4, 1978.

Decided June 18, 1979.

Rehearing and Rehearing In Banc
Denied Aug. 27, 1979.

Russel J. Topper, Chicago, Ill., for defendant-appellant.

Patrick W. O'Brien, William Thomas Braithwaite, Mayer, Brown & Platt, Chicago, Ill., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, BAUER, Circuit Judge, and VAN PELT, Senior District Judge.*

FAIRCHILD, Chief Judge.

This is a diversity action for breach of contract. Most of the events giving rise to this litigation occurred in Illinois and we accept the parties' assumption that Illinois law is applicable. The action below was tried before a jury which returned a verdict in the amount of $600,000, having found that a contract for the purchase of barge scrap steel existed between plaintiff, Luria Brothers & Co., Inc. (hereinafter referred to as "Luria") and defendant, Pielet Brothers Scrap Iron & Metal, Inc. (hereinafter referred to as "Pielet"), and that Luria was damaged as a consequence of Pielet's failure to deliver. Defendant appeals, arguing among other things that no enforceable agreement was ever made, and therefore, plaintiff was not entitled to damages. We affirm.

A consideration of the issues requires a statement of the facts in some detail. Luria, in its capacity as both a broker and a dealer is in the business of buying, selling, and processing scrap metal. Pielet is in the same business. The parties had done business with each other on a number of occasions prior to the transaction giving rise to this litigation. In fact, Lawrence Bloom, who represented Pielet in this matter had formerly been employed by Luria as a scrap trader.

Most of the facts surrounding the subject transaction are not in dispute and were stipulated to at trial. In mid-September, 1973, Bloom, a vice-president of Pielet, telephoned Richard Fechheimer, a vice-president of Luria. Bloom informed Fechheimer that Pielet might offer a substantial quantity of scrap metal for sale. Bloom inquired as to whether Luria would be interested in purchasing the metal and Fechheimer said that it would be. Subsequent telephone conversations took place between Bloom and Fechheimer in which price quotations and other matters were discussed. The quantity was to be 35,000 net tons of scrap steel from old barges cut into sections measuring five feet by five feet by twenty feet. The shipment date was to be on or before December 31, 1973. The price was set at $42 per net ton if Luria took delivery in Houston or $49 if Luria took delivery in Brownsville (Texas). This transaction was unusual in two respects. First, the amount of scrap involved was much larger than that in a typical scrap transaction. Secondly, while the type or grade of scrap was not unusual, the dimensions were. Luria intended to process the scrap for resale as "No. 1 heavy melting" scrap by reducing it to a size that would fit into a steel furnace,

---

* The Honorable Robert Van Pelt, Senior District Judge of the District of Nebraska, is sitting by designation.

generally in pieces at least ¼ inch thick and not more than 5 feet long by 18 inches wide.

Shortly after the foregoing conversations between Bloom and Fechheimer, Fechheimer telephoned Mr. Forlani, an account executive at Luria's Chicago office, to discuss the purchase of scrap from Pielet. Forlani made some handwritten notes on a worksheet which Luria uses in connection with buying and selling scrap. These notes related to the terms of the barge scrap transaction between Pielet and Luria. Subsequently, and sometime before September 24, Forlani made a telephone call to Bloom to discuss this scrap transaction. At some point, but before September 24, Bloom made some handwritten notes on a worksheet Pielet employed in connection with buying and selling scrap.

On September 24, 1973, Bloom caused to be prepared a sales confirmation relating to the scrap transaction between Pielet and Luria. The following information was typed on the confirmation form:

Quantity: Thirty-five thousand (35,000) net tons

Material: Steel barges cut 5′ × 5′ × 20′ free of non metallics

Price: $42.00 per net ton F.O.B. Shipping point barge Houston, Texas or $49.00 per net ton delivered Brownsville, Texas

Shipment: On or before December 31, 1973

Terms: 90% advance on receipt of surveyor's weights and bill of lading

Bloom signed the sales confirmation and mailed the original and one copy to Forlani. The copy bore the printed words "confirmation copy." The following words are printed at the bottom of both the original and the confirmation copy of Pielet's confirmation form: "PLEASE SIGN AND RETURN THE COPY OF THIS CONFIRMATION FOR OUR FILES. FAILURE TO RETURN COPY DOES NOT VOID CONTRACT." Neither Forlani nor any officer or other employee of Luria ever signed or returned the confirmation copy to Bloom or anyone else at Pielet.

In the ordinary course of business when Luria makes a purchase of scrap; information regarding the purchase is typed or written on its own purchase confirmation form. On or about October 4, 1973, Forlani caused to be prepared a purchase confirmation containing the same terms as in Pielet's form, except with respect to the delivery date and mode of shipment. The delivery date typed on the form was by October 31, 1973 and the mode of shipment appeared to be left to the discretion of Luria. On the reverse side of this form are printed standard terms including ones referring to warranties, insurance, and taxes, as well as one stating "This order constitutes the entire contract between the parties." The original and one copy of this form are sent to the seller. These bear in red letters the words "RETURN ACCEPTANCE COPY IMMEDIATELY" in the lower right hand corner. There were no other words on this document to indicate any condition as to the existence of a contract.

Forlani sent the original and a copy of the October 4th purchase confirmation to Bloom. Bloom testified that upon receipt of this document, he immediately or shortly thereafter called Forlani to inform him that the Luria confirmation was erroneous with respect to delivery date and mode of shipment. Forlani agreed that the confirmation was erroneous in these two particulars. Bloom asked Forlani to send him an amendment correcting these errors, but Forlani never did. Neither Bloom nor any other officer or employee of Pielet ever signed or returned the acceptance copy to Luria.

During late October and November, Forlani called Bloom several times to ask why Pielet had not begun to deliver the steel. Although the delivery date stated in Pielet's confirmation form and orally agreed upon was on or before December 31, 1973, it is "common trade practice" to space deliveries out during the contract period, especially where the quantity involved is very large. On December 3, 1973, Forlani wrote a letter to Pielet saying Luria had not receiving notification of shipment and requesting that prompt attention be given. On February 6, 1974 representatives of Luria met

with Bloom. Bloom stated he was having trouble with his supplier, and further mentioned that his supplier could not obtain the propane necessary for the torches used to cut the barges. On February 13, a week after the meeting, Luria wrote a letter to Bloom to make it clear that the matter had to be resolved. Luria never received a reply and Pielet never delivered the scrap. Luria filed its complaint in the district court on April 25, 1974.

### I.

■ Appellant first argues on this appeal that the evidence is insufficient to establish the existence of a contract, oral or otherwise. Given the facts of this case, we disagree.

■ The Uniform Commercial Code, which governs this case, specifically states that "a contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."[1] U.C.C. § 2–204(1) (Ill.Rev. Stat. Ch. 26, § 2–204 (1973)). In support of its theory of an oral contract, Luria presented testimony that the common trade practice in the scrap industry is to consummate deals on the telephone. Pielet contends that no trade practice, however well established, governs a contract if it conflicts with the expressed intentions of the parties. Specifically, Pielet relies on the language in the Luria confirmation form (stating that it constitutes the entire contract of the parties) along with Luria's admitted practice of using its own form in scrap transactions to preclude the existence of a contract where both parties have not signed the Luria form. Even if Luria's practice is to treat its own form as stating the terms of the sales contract, it does not automatically follow that Pielet's failure to sign and return the Luria purchase confirmation prevented a valid contract from arising.

■ While it is true that no oral contract exists if the parties intend not to be bound until a formal document has been executed, an oral agreement is enforceable if writings are intended only to memorialize a bargain already made. *Lambert Corporation v. Evans and Haines,* 575 F.2d 132, 135 (7th Cir., 1978). Pielet has failed to introduce any direct evidence that the former characterization is applicable to the transaction involved here.

■ Although Bloom testified that in large scrap transactions (those involving 5,000 tons or more) the industry practice and the practice between the parties was to sign and return acceptance copies, this in itself does not indicate that no contract exists until this event occurs.[2]

■ Next, Pielet contends that any apparent agreement between the parties based on the telephone conversations is illusory in light of the subsequent differences in the writings of the parties. Specifically, Pielet is referring to a delivery date of October 31, 1973 on Luria's purchase confirmation which contradicts the December 31, 1973 delivery date agreed upon when the agreement was made over the telephone. Also, the Luria confirmation left the mode of shipment up to its discretion while Bloom stated it had been agreed that shipment was to be by barge. Pielet relies on these discrepancies as an indication that there was never the "meeting of the minds" required for contract formation. Undisputed testimony at trial, however, established that the parties were in agreement as to these terms, both before and after the Luria writing was sent.

■ If a written confirmation or memorandum is in error as to any term, other than the quantity term, extrinsic evidence is admissible to correct the error. 1 Anderson, UNIFORM COMMERCIAL CODE § 2–201:26 (2d ed. 1970). Forlani testified that the failure of the purchase confirmation to specify mode of shipment was due to

---

1. The Uniform Commercial Code has been adopted in Illinois and is identical to the 1972 official text of the code.

2. Forlani and Bloom both testified that in prior dealings between the parties, acceptance copies were not always returned.

inadvertence and the wrong delivery date was due to clerical error in transcribing his handwritten notes.[3]

■ Luria also relied on U.C.C. § 2-207(3) to establish the existence of a contract. That section provides that "Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract . . ." Appellant's conduct following the exchange of confirmatory memoranda is entirely consistent with the existence of a contract. Bloom continued to make excuses for non-delivery as late as the February 6, 1974 meeting and there is no evidence that during that time he ever denied the existence of an enforceable agreement.

In light of the above, we think a jury could readily find that a contract existed between the parties.

## II.

Next, Pielet contends that even if the evidence is sufficient to establish the existence of a binding contract between the parties, it was error for the district court to exclude evidence that the sales contract was expressly conditional upon Pielet obtaining the scrap metal from a particular supplier. In an offer of proof, Bloom testified that in their first conversation in September, he told Fechheimer "I was doing business with people that I had never heard of, that they were fly-by-night people, that I was worried about shipment and if I didn't get shipment, I didn't want any big hassle, but if I got the scrap, he would get it." Trans. at 268.[4]

In excluding this offered testimony, the district court relied on the Uniform Commercial Code's parol evidence rule, § 2-202 (Ill.Rev.Stat. Ch. 26, § 2-202), which provides:

"Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

(a) By course of dealing or usage of trade (§ 1-205) or by course of performance (§ 2-208); and

(b) By evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement."

■■ The determination that the writings of the parties were intended to be a final expression of their agreement is to be made by the trial court. In light of Luria's acceptance of the terms stated in the Pielet writing, we agree with the district court's conclusion that the Pielet sales confirmation brought § 2-202 into play to bar Bloom's testimony.

Nevertheless, Pielet contends that § 2-202 is not applicable to this case. According to Pielet, Luria sued on an oral contract and therefore the parol evidence rule is not applicable because the writings of the parties were not the basis of the action but only collateral to it.

It is true that although these writings were relied on to satisfy the Code's Statute of Frauds, § 2-201, and to exclude parol evidence, Luria had to go outside these writings to prove to the jury the existence of an enforceable sales contract. But the writings are insufficient in themselves only because of two differing terms and are

---

3. The handwritten date on Forlani's worksheet (Luria's Exhibit 5) could be read as 10/31/73 or 12/31/73.

4. During the presentation of Luria's case, Bloom did testify on cross-examination that in conversations subsequent to the writings he told Forlani "if I get it [the scrap], you will get

it." We agree with Pielet that in that context, the jury would take this statement as an excuse for not delivering rather than as a condition of the contract. Therefore, if Bloom's testimony relating to his first conversation with Fechheimer was wrongfully excluded the harm would be prejudicial.

directly related to the contract sought to be proved.

■ As noted in 1 Anderson, UNIFORM COMMERCIAL CODE § 2–202:3 (2d 1970), § 2–202 of the Code "extends [the operation of the parol evidence rule] to some degree to writings which are not the complete contract of the parties." The code itself refers to this fact in § 2–207(3) which provides that where a contract is established by the conduct of the parties, the terms of the contract consist, at least, of those terms on which the writings agree even though "the writings of the parties do not otherwise establish a contract."

[11] In a case construing Illinois law, the court in *Jones & McKnight Corp. v. Birdsboro Corporation,* 320 F.Supp. 39 (N.D. Ill., E.D.1970) noted that where the existence of a sales contract was clear (in that case because of the actual delivery of goods and payment), § 2–202 "obviates the necessity of determining . . . whether the contract was oral or written." *Id.* at 42. Evidence of an alleged prior oral agreement cannot be used to contradict the terms on which the writings of the parties agree.

■ In this case, of course, the existence of a sales contract was in issue. At first glance, it is troublesome that Luria was allowed to introduce testimony of the September conversations between the parties to help establish its case while Pielet was denied the opportunity to introduce statements made in the course of those same conversations. However, the fairness of this result becomes clear upon examination of why it was necessary for Luria to use parol evidence to prove the existence of the sales contract. Pielet's sales confirmation and Luria's purchase confirmation differed on two important terms, delivery date and mode of shipment. Luria used undisputed parol evidence that there had been a "meet-

ing of the minds" as to these terms prior to the confirmatory memoranda to support its position that these two discrepancies were due to inadvertence and clerical error on Luria's part rather than disagreement between the parties. If the writings had agreed on these two important terms, Pielet would be hard pressed to argue that no contract for sale existed. In fact, Bloom testified that had the Luria purchase confirmation been correct on these points he would have signed and returned it. (Trans. at 67.) Allowing one party to use parol evidence to clarify a mistake in a writing, does not open the flood gates to any and all parol evidence bearing on the agreement.[5]

Having found § 2–202 applicable, the next question is whether the excluded evidence contradicts or is inconsistent with the terms of the writings. Pielet argues that the offered testimony did not "contradict" but instead "explained or supplemented" the writings with "consistent additional terms." For this contention, Pielet relies upon *Hunt Foods & Industries, Inc. v. Doliner,* 26 A.D.2d 41, 270 N.Y.S.2d 937 (1966). In reversing the trial court's summary judgment for plaintiff, the court in *Hunt* held that evidence of an oral condition precedent did not contradict the terms of a written stock option which was unconditional on its face. Therefore evidence of the condition precedent should not have been barred by U.C.C. § 2–202. "In a sense any oral provision which would prevent the ripening of the obligations of a writing is inconsistent with the writing. But that obviously is not the sense in which the word is used. [Citation omitted.] To be inconsistent the term must contradict or negate a term of the writing." *Id.* at 43, 270 N.Y. S.2d at 940. This reasoning in *Hunt* was followed in *Michael Schiavone & Sons, Inc. v. Securalloy Co.,* 312 F.Supp. 801 (D.Conn. 1970). In that case, the court found that

5. Pielet cites *McCormick on Evidence* § 56 (2d ed. 1972) for the proposition that once one party has introduced part of a conversation, the other party automatically has the right to introduce the remainder of the conversation relating to the same subject. This is a general rule of evidence based on materiality and relevance.

The parol evidence rule, on the other hand, is a rule of substantive law. Evidence is excluded not because it is not credible or not relevant but because of a policy favoring the reliability of written representations of the terms of a contract.

parol evidence that the quantity in a sales contract was "understood to be up to 500 tons cannot be said to be inconsistent with the terms of the written contract which specified the quantity as '500 Gross Ton.'" *Id.* at 804.

The narrow view of inconsistency espoused in these two cases has been criticized. In *Snyder v. Herbert Greenbaum & Assoc., Inc.,* 38 Md.App. 144, 380 A.2d 618 (1977), the court held that parol evidence of a contractual right to unilateral rescission was inconsistent with a written agreement for the sale and installation of carpeting. The court defined "inconsistency" as used in § 2–202(b) as "the absence of reasonable harmony in terms of the language *and* respective obligations of the parties." *Id.* at 623 (emphasis in original) (citing U.C.C. § 1–205(4)). See also *Southern Concrete v. Mableton Contractors,* 407 F.Supp. 581 (N.D.Ga.1975), *aff'd* memo., 569 F.2d 1154 (5th Cir. 1978).

■ We adopt this latter view of inconsistency and reject the view expressed in *Hunt.* Where writings intended by the parties to be a final expression of their agreement call for an unconditional sale of goods, parol evidence that the seller's obligations are conditioned upon receiving the goods from a particular supplier is inconsistent and must be excluded.

Had there been some additional reference such as "per our conversation" on the written confirmation indicating that oral agreements were meant to be incorporated into the writing, the result might have been different. See *Ralston Purina v. Rooker,*

346 So.2d 901 (Miss.1977), distinguishing *Paymaster Oil Mill Company v. Mitchell,* 319 So.2d 652 (Miss.1975).

We also note that Comment 3 of the Official Comment to § 2–202 provides, among other things:

"If the additional terms are such that, if agreed upon, they would certainly have been included in the document in the view of the court, then evidence of their alleged making must be kept from the trier of fact."

Pielet makes much of the fact that this transaction was an unusual one due to the size and the amount of scrap involved. Surely a term relieving Pielet of its obligations under the contract in the event its supplier failed it would have been included in the Pielet sales confirmation.

### III.

Pielet also argues that the failure of its supplier to deliver made performance of the contract commercially impracticable and therefore Pielet's performance under the contract was excused in accordance with U.C.C. § 2–615.[6]

■ Three conditions must be met before a seller is excused from performance under the Uniform Commercial Code:

"(1) a contingency must occur, (2) performance must thereby be made 'impracticable' and (3) the nonoccurrence of the contingency must have been a basic assumption on which the contract was made."

*Neal-Cooper Grain Co. v. Texas Gulf Sulphur Co.,* 508 F.2d 283, 293 (7th Cir. 1974).

---

**6.** U.C.C. § 2–615 provides:

Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance:

(a) Delay in delivery or non-delivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid.

(b) Where the causes mentioned in paragraph (a) affect only a part of the seller's capacity to perform, he must allocate production and deliveries among his customers but may at his option include regular customers not then under contract as well as his own requirements for further manufacture. He may so allocate in any manner which is fair and reasonable.

(c) The seller must notify the buyer seasonably that there will be delay or non-delivery and, when allocation is required under paragraph (b), of the estimated quota thus made available for the buyer.

Even assuming that Luria knew that Pielet intended to fulfill its contract obligation with scrap obtained from a particular source,[7] Pielet has failed to introduce evidence to satisfy the first two conditions.

With respect to the first requirement, we first note that while it is reasonable to assume that Pielet never received the barge scrap from its supplier, Pielet failed to introduce any direct evidence to establish that this contingency occurred. Secondly, the Official Comment to the U.C.C. states that "There is no excuse under [§ 2–615], however, unless the seller has employed all due measures to assure himself that his source will not fail." It is not clear that Pielet has done this.

To establish the requirement of impracticability, Pielet relies on the uniqueness of this scrap transaction. It is true that representatives of both parties testified that the amount of scrap involved was very large and that they had not often dealt in scrap obtained from cutup barges. However, the type of scrap involved, nonalloy steel scrap obtained from deteriorated objects, was a common subject of scrap transactions. Even if Pielet had expected to fulfill its obligation in a particular way, it had a duty to "employ any practicable alternative means of fulfilling the contract . . ." *Chemetron Corporation v. McLouth Steel*

*Corporation,* 381 F.Supp. 245, 257 (N.D.Ill., E.D.1974) (citation omitted), *affirmed,* 522 F.2d 469 (7th Cir. 1975). Pielet failed to respond to Luria's invitation to deliver substitute goods and failed to offer any evidence at trial that substitute scrap was not available. "The fact that performance has become economically burdensome or unattractive is not sufficient for performance to be excused." *Neal-Cooper Grain Co., supra* at 293. (Citations omitted.)

In conclusion, Pielet failed to introduce evidence sufficient to justify a jury instruction on commercial impracticability.

### IV.

Pielet argues that the jury instructions failed to properly instruct on the law of contract formation. As a result, Pielet further contends that the ultimate outcome of its case was seriously prejudiced. We disagree. The court instructed the jury generally on the law of contract formation. The record established that the jury instructions reflected the relevant code sections pertaining to contract formation as well as a wide range of alternative ways to consider the facts to this case.[8]

Pielet requested a more specific instruction in reference to whether Luria had accepted the terms Pielet offered in its September 24, 1973 written confirmation.[9] The court refused this instruction. In reliance on the language of U.C.C. § 2–207, Pielet

---

**7.** Pielet cited *Scialli v. Correale,* 97 N.J.L. 165, 117 A. 255 (1922) in support of its argument that the parties assumed a particular source of supply to obtain the amount of scrap metal involved in the transaction. Furthermore, Pielet concluded that when that source failed its performance was excused. It must be noted, however, that the contract in *Scialli* between the parties in the suit, expressly incorporated the contract between the seller and his supplier. While Pielet relies on the court's indication by way of *dicta* that a similar implied condition may excuse performance, this must be read as again referring to a situation where both parties have specifically agreed to a particular source of supply. Apart from the prohibited parol testimony discussed in Part II, no such showing has been made in the case at hand. Compare *Ralston Purina, supra* at 903 (without excluded parol evidence, defendant had no basis for defense of *force majeure,* U.C.C. § 2–617).

**8.** Specific reference to U.C.C. §§ 2–202, 2–204, 2–206 is relevant to a consideration of the formation and contents of a contract. See also Note, 30 U.Chicago L.Rev. 540 (1963).

**9.** *Refused Instruction:* "Defendant Pielet claims that Luria never did accept the terms and conditions that it submitted to Luria under its written Sales Confirmation of September 24, 1973.

In considering all the evidence in this case, if you should find that Luria expressly conditioned its acceptance of Pielet's Sales Confirmation upon Pielet's consent or assent to new and different terms and conditions requested by Luria, then you are to find that Luria had not accepted the Sales Confirmation of Pielet dated September 24, 1973."

maintains that the refused jury instruction would have permitted the jury to find that Luria never accepted the Pielet sales confirmation of September 24, 1973.[10] Specifically, this argument is in reference to Luria's written confirmation of October 4, 1973, which contained a different delivery date as well as additional terms such as those concerning warranties, indemnification and taxes which Pielet characterized as burdensome.[11] The refused instruction, Pielet maintained, would have provided a balancing effect for the jury in its determination of whether a contract existed.

■ In support of this argument, Pielet relies on *Roto-Lith, Ltd. v. F. P. Bartlett & Co.*, 297 F.2d 497 (1st Cir. 1962), for an interpretation of subsection (1) of U.C.C. § 2–207. The court held that "a response which states a condition materially altering the obligation solely to the disadvantage of the offeror is an 'acceptance * * * ex-

pressly * * * conditional on assent to the additional * * * terms.'" *Id.* at 500. As noted by this court in *C. Itoh & Co. (America) Inc. v. Jordan Intern. Co.*, 552 F.2d 1228, 1235 n. 5 (7th Cir. 1977), this interpretation of § 2–207 has been severely criticized by the commentators and often not followed by the courts. Discussing the application of § 2–207 to the "battle of the forms," the court stated that "it is now well-settled that the *mere presence* of an additional term . . . in one of the parties' forms will not prevent the formation of a contract under Section 2–207(1)." *Id.* at 1235 (emphasis in original) (citations omitted). Because there was no language in the Luria writing expressly conditioning acceptance on *assent* to the additional terms, the writing did not fail as an acceptance under § 2–207(1).[12]

■ We also note that Luria premised its case and the evidence was sufficient to

---

**10.** U.C.C. § 2–207 (Ill.Rev.Stat. Ch. 26, § 2–207 (1973)) provides:

(1) A definite and seasonable expression of acceptance or a written confirmation which is set within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
(a) the offer expressly limits acceptance to the terms of the offer;
(b) they materially alter it; or
(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act.

**11.** Luria offered testimony during trial to show that the earlier delivery date on its confirmation form was the result of a clerical error. It must also be noted that the new terms Pielet characterizes as burdensome (warranties, indemnification, and taxes) were printed on the

standard form used by Luria in prior transactions with Pielet. There is nothing in the evidence to show that Pielet objected to these terms in the past and it was stipulated at trial that there was no discussion of these terms with respect to the transaction in question.

**12.** The Luria purchase confirmation did have printed at the top of the form the following words: "Luria Brothers & Co., Inc. confirms purchase subject to terms and conditions on face and reverse sides." In *Construction Aggregates Corp. v. Hewitt-Robins, Inc.*, 404 F.2d 505, 509 (7th Cir. 1968), this court held that where a letter advised that acceptance was "predicated on the following clarifications, additions or modifications" to a purchase order, acceptance was "expressly made conditional on assent to the additional or different terms" and § 2–207(1) was therefore applicable. Although the writing did not state that acceptance was predicated on *assent* to the new terms, it was clear from the circumstances leading up to and surrounding this letter that such was the case. We do not read *Construction Aggregates* to say that the mere statement in a writing that it is subject to the terms included therein, along with the inclusion of additional or different terms, disqualifies the writing as an acceptance under § 2–207(1). For a discussion of the language necessary to bring a writing within the proviso of § 2–207(1), see *C. Itoh & Co., supra* at 1235 and *Dorton v. Collins & Aikman Corporation*, 453 F.2d 1161, 1168 (6th Cir. 1972).

support a jury finding that the Pielet and Luria forms operated as written confirmations of a prior oral agreement. While U.C.C. § 2–207 may be applicable in such a case to determine whether additional terms are part of the contract (a point not in issue here), an exchange of forms with differing terms following an oral agreement does not prevent the formation of the contract. *American Parts Co., Inc. v. American Arbitration Association,* 8 Mich.App. 156, 154 N.W.2d 5, 15 (1968).

## V.

Finally, Pielet argues that the jury verdict, which awarded damages at approximately one-half the amount claimed by Luria, reflected an improper compromise on the issue of liability and therefore a new trial must be ordered.

At trial, Luria claimed damages equal to the profit lost due to Pielet's failure to deliver. Its computations of lost profits were based on the difference between the projected selling price and the total of the price to be paid Pielet and the cost of processing and delivering the scrap. Although the evidence presented at trial to support the figures used in these computations was not disputed,[13] the computations were based on three major assumptions: (1) Luria would have taken delivery in Houston rather than Brownsville; (2) Since Luria could only process the scrap at the rate of 3,000 gross tons per month, the scrap would be sold at this same rate. (Since the price for processed scrap was rising in 1974, the rate at which the scrap would have been sold would have affected the total selling price received by Luria.); and (3) Luria could have sold the processed scrap to either United States Steel or ARMCO Steel at the prices then prevailing for No. 1 heavy melting scrap.[14] Computations illustrated that Luria might have made a total profit of $1,202,353 if it had sold all the scrap to United States Steel, or $1,222,395 if it had sold the scrap to ARMCO. Because the jury awarded damages of $600,000, Pielet maintains that this reflects the compromise character of the jury's verdict with respect to its liability. Relying on *National Fire Ins. Co. of Hartford v. Great Lakes Warehouse Corp.,* 261 F.2d 35, 38 (7th Cir. 1958), Pielet further contends that this type of compromise verdict "taints the entire proceeding" and therefore entitles defendant to a new trial on all the issues.

In *National Fire Ins. Co.,* the plaintiff brought the action against a public warehouseman to recover for fire damage to goods of plaintiff's insured. Plaintiff's insured lost 480 cases of Kool-Aid. Evidence was presented and undisputed that plaintiff paid a claim of $8,805.89 and recovered $2,299.92 in salvage, leaving a net loss of $6,505.97. The jury returned a verdict for $3,252.49, approximately one-half of $6,505.97. The trial court refused to grant defendant's motion for a new trial, a refusal which the Court of Appeals held to be error. The facts of this case are readily distinguishable from the instant case.

We deem it pertinent to examine the instruction to the jury in *National Fire Ins. Co.* with respect to the measure of damages:

". . .—if you find for the plaintiff, it will be your duty to assess its damages, if any. In fixing an amount of damages, the measure of damages is the fair cash market value of the Kool-Aid immediately before the fire less the fair cash market value of any part of the Kool-Aid

---

**13.** Pielet presented no evidence to refute Luria's computation of damages. However, on closing argument, Pielet's attorney pointed out that Luria's damage computations were premised on spreading the resale of the scrap over a 12 month period during which the price of steel scrap was rising.

**14.** United States Steel and ARMCO were only prospective buyers since Luria did not have a purchase order from either customer for the scrap purchased from Pielet. During trial, however, testimony revealed that Luria had transacted a substantial amount of business with both parties, and could have sold the scrap had it been available.

that was salvaged after the fire." *National Fire Ins. Co., supra* at 37.[15]

Because the amount sought was liquidated and based upon completed past transactions, the court decided that there was no evidence introduced from which the jury could have drawn any reasonable inference that the loss was other than $6,505.97. The court concluded that the jury must have disregarded the jury instruction in assessing the damages and ordered a new trial on all issues. The court also noted that the issue of liability was an extremely close question thereby making necessary a "more careful scrutiny of the jury's verdict than otherwise might be the case." *Id.* at 37.

■ In our view, the evidence in the present case presented a strong showing of liability. Furthermore, unlike *National Fire Ins. Co.* it was not unreasonable for the jury to have assessed damages at a figure lower than that requested by the plaintiff. Luria's computation of damages reflected numerous assumptions. We think the reduced award by the jury demonstrated a conservative approach on projected profits rather than a compromise on liability.

■ The jury is entitled to disregard the damages asked for if they do not agree with the computations or if other evidence is introduced from which jurors could draw their own conclusions. See *Brunswick-Balke-Collender Co. v. Foster Boat Co.*, 141 F.2d 882, 885 (6th Cir. 1944). There is no presumption that a verdict of approximately half the lost profits shown in the evidence is a compromise on the issues of damages and liability. Pielet relies on cases we think are distinguishable from the case at hand on the basis of liquidated damages, close question of liability, and finally most involved damages claimed or awarded not in excess of $25,000. See *Selamakos v. Vic-*

tory Ice and Ice Cream Co., 246 Ill.App. 178 (1927), *Galomopoulos v. Petropoulos*, 147 Ill. App. 1 (1909), *Grimm v. California Spray-Chemical Corp.*, 264 F.2d 145 (9th Cir. 1959). Pielet cites the case of *Jamison Co., Inc. v. Westvaco Corp.*, 526 F.2d 922 (5th Cir. 1976) in further support of its argument that a jury verdict cannot be honored where it is not supported by any reasonable evidence. The court, while stating it was never eager to set aside a jury verdict, nevertheless, could not determine the basis of liability and concluded the verdict exceeded the maximum damages the jury could have awarded based on the evidence. The court stated:

> After analyzing the contract, evidence, charge, and jury verdict with their many possible alternatives, asymetrical incongruencies, potential solecisms, and error compounded upon error, we have no doubt but that the jury verdict was either aleatory or illogical." *Jamison, supra* at 935.

■ The rule is however, "that the record itself viewed in its entirety must clearly demonstrate the compromise character of the verdict otherwise it is not error for the trial judge to refuse to set the verdict aside on this ground." *Maher v. Isthmian Steamship Co.*, 253 F.2d 414, 419 (2d Cir. 1958). Applying this principle to the facts and evidence in this case we cannot say that the record clearly demonstrates a compromise verdict. Where the plaintiff's damage computations were premised upon several major assumptions which the jury would have been entitled to question, the failure of the defendant to produce any witnesses or other evidence to rebut the computations, in and of itself, did not preclude the jury from assessing the damages at a figure less than that requested.

The judgment appealed from is affirmed.

---

15. The jury instruction in the instant case was given in the following manner:

"The fact and amount of Luria's losses may be proved in any manner that is reasonable under the circumstances. In deciding the question of damages, you may consider all evidence you find relevant to the commercial situation in which the parties acted.

The law does not require Luria to prove the amount of its losses with mathematical precision. The law requires that losses resulting from the breach of a sales contract be proved only with as much definiteness and accuracy as the circumstances permit."