**BENDE AND SONS, INC., Plaintiff,**

v.

**CROWN RECREATION, INC., KIFFE PRODUCTS DIVISION, Defendant.**

No. 78 Civ. 428.

United States District Court,
E. D. New York.

Sept. 21, 1982.

---

**3.** Due to the disposition of this case, it is unnecessary to address defendants' claim that the

complaint should be dismissed for failure to join indispensable parties.

Sunshine & Sunshine, New York City, for plaintiff.

Jesse B. Hecht, New York City, for defendant.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

This is a breach of contract action involving the sale of 11,000 pairs of combat boots.

The plaintiff, Bende and Sons, Inc., ("Bende"), is a New Jersey corporation that sells military supplies internationally. Kiffe Products ("Kiffe") is a division of the defendant Crown Recreation, Inc., a New York Corporation that sells camping equipment and military supplies.

Bende contends that it had a contract to supply the Government of Ghana with 10,000 pairs of boots; that Kiffe agreed to manufacture the boots in Korea and to deliver them in Ghana; that Kiffe failed to deliver the boots on the agreed date; and that as a result of this failure Bende suffered $44,685 in damages when the Government of Ghana cancelled its resale contract. Kiffe responds that its non-delivery was excused by the derailment of the train transporting the boots; and Kiffe asserts that it satisfied its obligations under the Uniform Commercial Code by seasonably offering delivery of the boots at a later date.

After a bench trial, I find that the non-delivery of the combat boots was not excused and that Bende is entitled to recover its lost profits of $44,685.

## FACTS

In May, 1977, Bende agreed to sell the Government of Ghana 10,000 pairs of combat boots for $158,500. Under the terms of the agreement, delivery was to be "immediate" or "as soon as possible." In order to fill its order with Ghana, Bende, in turn, contacted Kiffe in late June and began negotiations. On or about July 11, 1977, Bende ordered 10,000 pairs of combat boots for $95,000 from Kiffe. In addition to specifying the size distribution, the July 11th purchase order described the boots as follows:

> leather upper, lace-up front, black, with reinforced bottom sole, Korean made but all Korean markings removed from boots, in neutral boxes, in sizes.

The purchase order further directed that Kiffe's supplier imprint "Bende, Clifton NJ USA" inside the boots. While no delivery date was set forth on the order, it is clear

from the testimony at trial that the parties agreed that delivery would be made between 60 and 90 days from the date of a firm order. Transcript ("Tr."), Bende testimony at 81, Schulman testimony at 151. It is equally apparent that, although the July 11, 1977 purchase order did not mention the Ghana resale, Kiffe knew that Bende was going to resell the boots. Tr. at 175.

The June negotiations also resulted in an agreement that, because Bende had an insufficient credit history with Kiffe, Bende would pay for the boots by obtaining an unconditional letter of credit.

Bende obtained the letter of credit on or about July 22, 1977 and assigned the proceeds to Kiffe a few days later. The letter of credit was initially set to expire on October 14, 1977, but was subsequently extended to November 30, 1977. On or about July 26, 1977, Bende sent a second purchase order to Kiffe for an additional 1000 pairs of combat boots. The specifications in this second order concerning the markings on the boots and the packaging were identical to those in the first order.

Kiffe placed the order for 11,000 pairs of boots with its Korean supplier on July 29, 1977. For reasons not necessary to detail here, the parties subsequently agreed that the requested Bende inscription would not appear on the boots.

The boots were manufactured in Korea, placed in containers and then shipped by boat from Korea to the United States, arriving in Seattle on or about October 7, 1977. They were loaded on railroad cars for shipment to the East Coast. Unfortunately, the train transporting the boots derailed on November 9, 1977, and most of the boots were destroyed in the area of Omaha, Nebraska. As Kiffe itself conceded, the boots were destroyed while the risk of loss was still on Kiffe. The remains of the shipment were sent to a receiving warehouse operated by Pre-Con International located in Secaucus, New Jersey.

Up to this point in the narrative the parties are much in agreement. There is,

however, a stark disparity in the trial testimony as to what happened next.

The plaintiff, Bende, claimed that after it was informed of the derailment, it notified the Government of Ghana that the 11,000 pairs of boots would not be delivered, but that the Government of Ghana agreed that Bende would save the original May order by delivering 1,000 pairs as soon as possible with the remaining 9,000 to be delivered at a later date. The plaintiff further testified that he met with representatives of the defendant in late November at the Pre-Con warehouse, determined that there were at least 1000 good pairs of combat boots remaining, and asked the defendant for those boots. After the defendant refused to give the plaintiff the 1000 good pairs, the plaintiff tried to obtain substitute boots from at least four other suppliers. The Government of Ghana, however, cancelled the order on January 31, 1978 because the plaintiff's efforts to secure boots from other sources had failed.

Although various Kiffe sales representatives conceded that they met with the plaintiff in late November at the Pre-Con warehouse, their testimony was that the shipment was a *total* loss and that plaintiff made *no* request for the remaining boots. Additionally, the Vice-President of the defendant Crown Recreation testified that, because the entire shipment had been lost, he offered to re-order the 11,000 pairs of boots from Korea at the original contract price and to have them delivered within 60 days. This offer, according to the defendant, was never accepted by the plaintiff.

### THE LAW

Defendant's core defense is that the November 9, 1977 train derailment excused its performance under the contract. It invokes two provisions of the Uniform Commercial Code (UCC) to support this contention.

It first argues that the boots were "identified to the contract" and, because the derailment did not result from any fault on their part, the contract is avoided under

§ 2–613 of the U.C.C.[1] Alternatively, assuming that the particular boots involved in the derailment were *not* specifically identified to the contract, it argues that the derailment was a contingency unforeseen by the parties at the time of contracting, thus excusing the defendant's performance under section 2–615 of the U.C.C. Reliance on these sections, however, is misplaced.

*U.C.C. § 2–613*

Even on the assumption that there was a total loss, the defendant has failed to satisfy its burden of showing that the combat boots involved in the derailment were the particular boots specified in the contract. *Bunge Corp. v. Recker,* 519 F.2d 449 (8th Cir. 1975); *Conway v. Larsen Jewelers, Inc.,* 104 Misc.2d 872, 429 N.Y.S.2d 378 (1978); *Valley Forge Flag Co. v. N. Y. Dowel & Moulding Import Co.,* 90 Misc.2d 414, 395 N.Y.S.2d 138 (1977). Identifying the goods by kind and amount is insufficient; rather, there "must be a meeting of the minds by the parties as to the particular or actual goods designated." *Valley Forge Flag Co., supra,* 395 N.Y.S.2d at 139. Although it is often difficult to determine whether goods have been identified to the contract, several factors militate against such a conclusion here.

First, while the parties understood that the boots were to come from Korea, nothing in the contract designated the particular manufacturer of the goods. Indeed, the contract could have been fulfilled by any 11,000 Korean-made boots.

Second, at the time Bende sent the purchase orders, Kiffe had not yet entered into a contract with its supplier. Thus, the purchase orders could not have specifically identified any particular combat boots. *Valley Forge Flag Co., supra,* 395 N.Y.S.2d at 139. In fact, the purchase orders were subsequently modified by the parties once it was determined that Bende's request to have its name imprinted on the boots could not be met. Only *after* the specifications were set forth in the two purchase orders was it determined that all of the goods would be shipped from Korea.

Finally, in order to be "identified" within the meaning of Section 2–613 of the U.C.C., the boots must have been "shipped, marked, segregated or otherwise designated at the time the sale was made." *Carlson v. Nelson,* 28 U.C.C. Rep.Serv. 80 (1979). Because there were no Bende or Korean markings either on the boots or on the containers used to transport the goods, any combat boots would have fit the general description outlined in the purchase orders.

I conclude, therefore, that the boots were not identified to the contract. Accordingly, the defendant's performance was not excused under section 2–613 of the U.C.C.

*U.C.C. § 2–615*

Section 2–615 of the Code, set forth in full in the note[2], provides an alternative

1. Section 2–613 of the U.C.C. provides as follows:

Where the contract requires for its performance goods identified when the contract is made, and the goods suffer casualty without fault of either party before the risk of loss passes to the buyer, or in a proper case under a "no arrival, no sale" term (Section 2–324) then (a) if the loss is total the contract is avoided; and (b) if the loss is partial or the goods have so deteriorated as no longer to conform to the contract the buyer may nevertheless demand inspection and at his option either treat the contract as avoided or accept the goods with due allowance from the contract price for the deterioration or the deficiency in quantity but without further right against the seller.

2. Section 2–615 of the U.C.C. provides as follows:

Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance: (a) Delay in delivery or non-delivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid. (b) Where the causes mentioned in paragraph (a) affect only a part of the seller's capacity to perform, he must allocate produc-

excuse for non-performance. The Code reflects the common-law standard of impracticability, and, as the official comment makes clear, requires that the impracticability be caused by "unforeseen supervening circumstances not within the contemplation of the parties at the time of contracting." (Official Code Comment, U.C.C. § 2–615).

■ The defendant has the burden of proving a defense under § 2–615, *Luria Bros. & Co. v. Pielet Bros. Scrap Iron,* 600 F.2d 103, 111–12 (7th Cir. 1979). In short, the defendant must demonstrate either that (1) the contingency that made performance commercially impracticable was not foreseeable at the time of contracting, or (2) the contract contains specific, exculpatory language excusing non-performance under certain circumstances, *Eastern Airlines, Inc. v. McDonnell Co.,* 532 F.2d 957, 992 (5th Cir. 1976). Because defendant seller can meet neither of these requirements, the § 2–615 defense is unavailable.

■ The foreseeability requirement does not entail contemplation of a specific contingency; rather, it is sufficient that the contingency that eventually occurred could have been foreseen as a real possibility that would affect performance. *United States v. Wegematic Corp.,* 360 F.2d 674 (2d Cir. 1966). Although it does not appear that Bende and Kiffe ever contemplated a train derailment (the "specific contingency"), common sense dictates that they could easily have foreseen such an occurrence. In fact, defendant did foresee at least one specific contingency that would have adversely affected performance; namely, a potential dock strike in New York. (Tr. at 161, testimony of Stanley Schulman, Vice-President of Crown Recreation).

■ Inasmuch as I find that the derailment was not unforeseeable, there is no excuse for non-performance under § 2–615 unless there is specific, exculpatory language in the contract; e.g., "seller shall be excused from performance in the event of a derailment of the train transporting goods from seller to buyer." *See Matter of Westinghouse Elec. Corp., Etc.,* 517 F.Supp. 440 (E.D.Va.1981). Nothing approaching such language is found in the contract. Defendant also fails, therefore, to meet the second alternative for excused non-performance under § 2–615.

## DAMAGES

Section 2–713(1) of the U.C.C. defines the measure of damages in a non-delivery case as:

> "the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages . . . less expenses saved in consequence of the seller's breach.

Additionally, section 2–715(2)(a) allows the buyer to recover consequential damages (lost profits) "which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise."

■ Applying these rules, I find that the plaintiff is entitled to damages of $44,685.[3] The defendant conceded that it was aware when it contracted with Bende, that Bende was going to resell the boots. (Tr. at 175). Furthermore, even if Bende failed to establish that 1000 pairs of good combat boots survived the crash and that it requested such boots from Kiffe, I, nonetheless, find that Bende did make a good faith effort to order substitute boots from other suppliers (Tr. at 31) as well as from Barry Green, the representative of Expert Sales and Salvage

---

tion and deliveries among his customers but may at his option include regular customers not then under contract as well as his own requirements for further manufacture. He may so allocate in any manner which is fair and reasonable.

(c) The seller must notify the buyer seasonably that there will be delay or nondelivery and, when allocation is required under paragraph (b), of the estimated quota thus made available for the buyer.

**3.** $158,500 (resale contract price), less $95,000 (contract price), less $16,815 (freight charges), less $2,000 (miscellaneous costs which otherwise would have been incurred had the breach not occurred) = $44,685.

(Tr. at 204). This effort satisfied its obligations under section 2–715(2)(a) of the U.C.C.

These constitute my Findings of Fact and Conclusion of Law.