494 A.2d 438

Robert J. EMERY, Sr., Administrator of the Estate of
Robert J. Emery, Jr., Deceased

v.

E. Vaughn WEED, Frank Weed and Henry Weed, Individual-
ly and T/A Weed Chevrolet Co., Appellants.

Superior Court of Pennsylvania.

Argued May 2, 1984.

Filed June 7, 1985.

Thomas J. Profy, III, Bristol, for appellants.

William L. Goldman, Doylestown, for appellee.

Before SPAETH, President Judge, and BROSKY and BECK, JJ.

SPAETH, President Judge:

This action arises out of an agreement by appellee's son to purchase a Pacer Corvette automobile from appellant, a Chevrolet dealer. Appellee's son made several downpayments, but before payment was made in full, the Pacer was stolen from appellant's premises. Shortly afterwards, appellee's son died. Appellee, as his son's administrator, then sought to cancel the agreement and to recover his son's downpayments. The trial court sitting en banc, one judge dissenting, held that appellee is entitled to this relief; in doing so, the court dismissed appellant's counterclaim that it is entitled to keep the downpayments, and also, to recover damages in the amount of the difference between the purchase price of the Pacer and its market value on the date appellee sought to cancel the agreement. We affirm.

On June 7, 1978, appellee's son, Robert Emery, Jr., signed an agreement to purchase from appellant, for $25,000, a 1978 Chevrolet "Pacer Corvette," serial number

1Z87L85901303. (By "appellant" we mean the partnership Weed Chevrolet Company as well as its three partners.) When appellee's son signed the agreement, he paid appellant $10,000 toward the purchase price. R.R. 114a. On June 27, July 12, August 10, and September 28, 1978, he made additional payments, totaling $2,229.90. R.R. 115a–18a. On or about November 5, 1978, the Pacer was stolen from appellant's premises. N.T. 39. On November 15, 1978, appellee's son died. N.T. 8. Appellee then sought to cancel his son's agreement for the purchase of the Pacer and demanded a refund of the $12,229.90 paid toward its purchase. N.T. 10–12. When appellant refused, appellee instituted this action. The testimony that was given at the ensuing trial may be summarized as follows.

Edward A. Marcella, who sold the Pacer to appellee's son, testified that some 6,500 Pacers were manufactured in 1978, each Chevrolet dealer being entitled to one. N.T. 35–37. Mr. Marcella further testified as follows:

Q. What took place physically with the car after the sales contract was entered into with Mr. Emery [appellee's son]?

A. Well, we continued to have it on the showroom floor; and after Mr. Emery made some payments to us we decided to take it off the floor because we were getting inquiries, and the fact it was sold we felt we would take it and put in our new prep area in the back where we locked it up and covered it.

Q. Did Weed Chevrolet entertain any offers or proposals or in any way attempt to sell the motor vehicle after that contract was entered into with Mr. Emery?

A. Anybody asked me, I told them it was sold. We didn't make any attempt.

Q. Was that company policy?

A. Yes, sir.

Q. And you say it was sometime shortly after June 7th it was taken out of the showroom to the prep area?

A. Yes, sir.

Q. Was it covered?

A. Yes, sir.

Q. Was it locked?

A. Definitely locked.

Q. Was it in an enclosed building?

A. Yes, sir.

N.T. 38–39.

E. Vaughn Weed testified to the same effect, N.T. 50, as did Frank Polizzi, appellant's sales manager, N.T. 81.

Fred Totten, principal of Totten Chevrolet in Florence, N.J., testified that he had agreed to sell appellant the Pacer Corvette alloted to him, which he described as "[m]y 1978 Limited Edition", as a replacement for the Pacer stolen from appellant's premises. N.T. 67–69. Appellant attempted to prove by Mr. Totten that all Pacer Corvettes were identical, except for their serial numbers, N.T. 72–73, but the trial court sustained an objection to such testimony, stating: "He told us he never saw the one that was the subject of this contract. He never saw it, and I presume he did not see every one of the other 6,500 plus ones. Now, if you lay some foundation to show me that he knows that each one was exactly the same in every significant detail, that is another matter." N.T. 73. Mr. Totten then testified without objection that all Pacer Corvettes are painted black and silver. N.T. 75.

Mr. Polizzi testified that when appellee's son learned that the Pacer Corvette sold him had been stolen, he visited appellant's showroom:

He wanted to know about his car. He had read or heard, I guess, that it was stolen. In the meantime, Mr. Weed told me he had one available, so I told Emery that we had one identical to the one that was stolen available for him.

Q. What did—

A. He said, good, that's all I want. And he left and he went back to Mr. Marcella.

N.T. 81–82.

Mr. Marcella testified that appellee's son did meet with him, and "I just asked him if everything was okay. He said, 'Fine.' That was it." N.T. 40.

On the basis of Mr. Marcella's and Mr. Polizzi's testimony,[1] appellant argues that appellee's son agreed to accept as a replacement for the Pacer Corvette sold him the Pacer that Mr. Totten had agreed to provide, and that therefore the agreement was modified. We may dispose of this argument summarily. The trial court did not believe Mr. Marcella's and Mr. Polizzi's testimony, characterizing it as "out of the whole cloth." Slip op. at 3. We shall not disturb that finding. *Rogers v. Hammett*, 229 Pa.Super. 6, 323 A.2d 394 (1974).

Appellant argues nevertheless that it is entitled to keep the downpayments appellee's son made, and also, to recover damages in the amount of $12,000, this representing the difference between the purchase price of the Pacer Corvette ($25,000) and its market value as of the date appellee sought to cancel the contract (which appellants say was $13,000). This argument turns upon 13 Pa.C.S. § 2613, which provides:

> When the contract requires for its performance goods identified when the contract is made and the goods suffer casualty without fault of either party before the risk of loss passes to the buyer ... then
>
> (a) if the loss is total the contract is avoided;
>
> . . . .
>
> *Id.*

■ White and Summers have described Section 2–613 of the Uniform Commercial Code, on which 13 Pa.C.S. § 2613 is based, as follows:

> [S]ection 2–613 frees the seller from his obligation "if the loss is total," .... That limited exception to the risk of

---

1. We note that no objection was made to the testimony of Messrs. Polizzi and Marcella. *See* Dead Man's Act, Act of July 9, 1976, P.L. 586, No. 142, § 2, *as amended,* 42 Pa.C.S. § 5930; *Estate of Kofsky,* 487 Pa. 473, 409 A.2d 1358 (1979); *Visscher v. O'Brien,* 274 Pa.Super. 375, 418 A.2d 454 (1980).

loss rule applies only in the case of "goods whose continuing existence is presupposed by the agreement." § 2-613, Comment 1. It has no application to the typical case in which the seller is selling garden variety goods to a buyer under a usual sale of goods contract.

White and Summers, Uniform Commercial Code 175 n. 2 (2d ed. 1980).

Most frequently it is the seller who seeks to prove that Section 2-613 applies, for if the section does not apply, the seller may be liable for loss-of-bargain damages, or the difference between the contract price and the market price, *see, e.g.*, 13 Pa.C.S. § 2713, or specific performance may be ordered, *id.* § 2716. If Section 2613 does apply, however, and the loss is total,[2] the buyer is limited to cancelling the contract and receiving a refund of his downpayment. In *Conway v. Larsen Jewelers, Inc.*, 104 Misc.2d 872, 429 N.Y.S.2d 378 (1980), for example, the action was for the market price of a necklace that had increased in value between the date the plaintiff made a downpayment on its purchase and the date it was stolen. The court found that the necklace was unique and that Section 2-613 applied, and accordingly held that the plaintiff was limited to recovering her downpayment. In *Carlson v. Nelson*, 204 Neb. 765, 285 N.W.2d 505 (1979), the court held that the party seeking to take advantage of Section 613 has the burden of satisfying each provision of the section. Thus, there, to defeat the buyer's claim for damages, the seller was required to prove that the damage to the goods while in his possession occurred without his fault.[3]

2. If damage to the goods is partial, the buyer may "at his option either treat the contract as avoided, or accept the goods with due allowance from the contract price for the deterioration or the deficiency in quantity but without further right against the seller." 13 Pa.C.S. § 2613(2).

3. Appellant principally relies upon *Conway v. Larsen Jewelers, Inc., supra,* and *Barbarossa and Sons, Inc. v. Iten Chevrolet, Inc.*, 265 N.W.2d 655 (Minn.1978). We have discussed *Conway. Barbarossa* is not in point for it arose under Section 2-615, not Section 2-613, of the Uniform Commercial Code.

To date, the cases that have arisen under Section 2–613 have largely involved damage to or destruction of mass quantities of goods where the buyer asserts a claim for damages and the seller maintains that its liability is limited by Section 2–613. *Bende & Sons, Inc. v. Crown Recreation, Inc., Kiffe Products Division,* 548 F.Supp. 1018 (E.D. N.Y.1982), *aff'd* 722 F.2d 727 (2d Cir.1983) is illustrative. There, Bende agreed to sell combat boots to Ghana and contracted with Kiffe to supply them. The boots Kiffe shipped were destroyed in a train derailment. The court stated:

> Even on the assumption that there was a total loss, the defendant failed to satisfy its burden of showing that the combat boots involved in the derailment were the particular boots specified in the contract ... Identifying the goods by kind and amount is insufficient; rather, there "must be a meeting of the minds by the parties as to the particular or actual goods designated" ... Although it is often difficult to determine whether goods have been identified to the contract, several factors militate against such a conclusion here.

> First, while the parties understood that the boots were to come from Korea, nothing *in the contract* designated the particular manufacturer of the goods ...

> Second, at the time Bende sent the purchase orders Kiffe had not yet entered into a contract with its supplier. Thus, the purchase orders could not have specifically identified any particular combat boots....

> Finally, in order to be "identified" within the meaning of Section 2–613 of the U.C.C., the boots must have been "shipped, marked, segregated or otherwise designated at the time the sale was made ..." Because there were no Bende or Korean markings either on the boots or on the containers used to transport the goods, any combat boots would have fit the general description outlined in the purchase orders.

> *Id.* at 1021 (citations omitted; emphasis in original).

See also *Bunge Corporation v. Recker*, 519 F.2d 449 (8th Cir.1975) (soy beans); *Dreyfus Co., Inc. v. Royster*, 501 F.Supp. 1169 (E.D.Ark.1980) (same); *Semo Grain Co. v. Oliver Farms, Inc.*, 530 S.W.2d 256 (Mo.App.1975) (same); *Valley Forge Flag Company, Inc. v. New York Dowel & Moulding Import Co., Inc.*, 90 Misc.2d 414, 395 N.Y.S.2d 138 (1977) (dowels).

■ Here, of course, appellee as the buyer has not claimed damages; he simply asks that his son's downpayments be refunded. It is appellant, the seller, that asserts that Section 2613 does not apply to this case. Since appellee relies on Section 2613, it was appellee's burden to prove that each provision of Section 2613 has been satisfied.

■ With respect to several of these provisions, there is no dispute. The parties agree that the Pacer Corvette "suffer[ed] casualty without fault of either party," 13 Pa. C.S. § 2613, *supra*, and that the casualty was "total" and occurred "before the risk of loss [had] pass[ed] to the buyer," *id.*[4] The remaining provision of Section 2613 that appellee had to prove was satisfied is whether "the contract requir[ed] for its performance goods identified when the contract was made." 13 Pa.C.S. § 2613. As to this provision the parties are in disagreement.

■ The item "identified when the contract was made" was the Pacer Corvette identified in the agreement of sale by its serial number. Appellant argues that it was not required by the agreement to deliver that very Pacer be-

---

**4.** The trial court held that risk of loss had not passed to appellee because appellant was holding the automobile as a bailee and the conditions of 13 Pa.C.S. § 2509(b) had not been met. Majority slip op. of trial court, at 4. We do not believe that appellant was a bailee, for it was holding the automobile not for the benefit of appellee's son, but to assure payment. We nevertheless agree with the trial court that risk of loss had not passed, but we base that conclusion on 13 Pa.C.S. § 2509(c) ("In any case not within subsection (a) or (b), the risk of loss passes to the buyer on his receipt of the goods if the seller is a merchant …").

cause, it asserts, "[e]ach such automobile was identical to all of the others manufactured, down to the details with respect to the paint job and the extras." Brief for Appellant at 14. This assertion, however, is not supported by the record, which only shows that all Pacer Corvettes were painted black and silver; as will be recalled, the trial court disallowed testimony to the effect that all Pacer Corvettes were identical. Quite apart from its identification in the agreement by serial number, the Pacer was identified by being removed from the display showroom, after the agreement was signed, and being covered and locked. From this it may be inferred that there was "a meeting of the minds as to the particular or actual goods designated." *Bende & Sons, Inc., supra.* This agreement by appellant and appellee's son that appellant would deliver the Pacer identified in the contract was in no way affected by Mr. Totten's later apparent willingness to provide appellant with a different Pacer. Appellant argues that "the parties ... did not consider the particular automobile [the Pacer identified in the agreement by its serial number] to be unique ..." Brief for Appellant at 23. However, Section 2613 does not require such proof; it only requires that appellee establish that the "contract require[d] for its performance [the Pacer Corvette] identified when the contract [was] made." He has done so.[5]

Affirmed.

**5.** In thus concluding that the requirements of Section 2613 have been satisfied, we have not overlooked the statement, quoted on pages 440–441, *supra,* by White and Summers that Section 2613 "has no application" to the "usual sale" of "garden variety goods." At $25,000, the Pacer was hardly a "garden variety" item. In any event, although we need not decide the point, there may be circumstances in which a contract for the sale of "garden variety goods" might come within Section 2613, where the contract was not "a usual sale of goods contract," White and Summers, *supra,* and the goods were described with particularity in the contract. *Valley Forge Flag Company, Inc., v. New York Dowel Moulding Import Co., supra,* at 415, 395 N.Y.S.2d at 139.