165 F.3d 1071
 Ina CARTER, individually and as administratrix of the Estate
of Richard Pack, deceased, Plaintiff-Appellant,
v.
CHICAGO POLICE OFFICERS M.L. Moore and G. Price and the City
of Chicago, Defendants-Appellees.
 No. 96-3209.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 18, 1998.
Decided Dec. 31, 1998.
 
 Daniel S. Alexander (argued), Arnold & Alexander, Chicago, IL, for Plaintiff-Appellant.
 Lawrence Rosenthal, Benna R. Solomon (argued), Anne Berleman Kearney, Susan S. Sher, Office of Corporation Counsel, Appeals Division, Chicago, IL, for Defendant-Appellee Moore.
 Susan S. Sher, Office of Corporation Counsel, Appeals Division, Chicago, IL, for Defendants-Appellees Price and City of Chicago.
 Before POSNER, Chief Judge, and FLAUM and KANNE, Circuit Judges.
 KANNE, Circuit Judge.
 
 
 1
 What began as a normal day for nineteen-year-old Richard Pack ended with his death shortly after an altercation outside his apartment with Chicago Police Officers M.L. Moore and Garland D. Price. Pack's mother, Ina Carter, individually and as administratrix of his estate, filed suit against Moore, Price, and the City of Chicago alleging that the officers used excessive force during their encounter with Pack and deprived him of his Fourth Amendment right to be free from unreasonable searches and seizures and that Moore, Price, and the City of Chicago were liable under the Illinois Wrongful Death Statute and for tortious assault and battery under Illinois law. The jury found in favor of Carter as to Moore and against Carter as to Price on both the excessive force and unreasonable seizure claims. It found against Carter as to all of the defendants on the state law claims for wrongful death and assault and battery. The jury awarded Carter $50,000 in damages on the excessive force claim and $50,000 in damages on the unreasonable seizure claim. On appeal, Carter presents two issues to this Court. First, she claims the District Court committed reversible error by failing to instruct the jury as to the definition of proximate cause. Second, she contends the District Court erred by failing to grant her a new trial based on her contention that the jury's verdict was inconsistent and the result of jury compromise. Because we find that Carter waived her objection to the District Court's failure to provide the jury with a definition of proximate cause and the verdict was neither inconsistent nor the result of jury compromise, we affirm the judgment of the District Court.
 
 I. HISTORY
 A. Factual Background
 
 2
 At the time of his death, Richard Pack had significant health problems. In addition to suffering from partial paralysis, cerebral palsy, and an enlarged heart and liver, Pack had been largely confined to a wheelchair since he suffered a stroke two years earlier. Doctors classified Pack's cardiac function as a three on a scale of four in terms of the severity of his heart dysfunction, with four being the worst. His own cardiologist, Dr. Tyrone Daniels, characterized Pack's heart as being able to function at one-sixth of normal capacity. Despite being treated with medication for his health conditions, Pack nonetheless had serious limitations on his physical activity.
 
 
 3
 During the afternoon of October 16, 1994, Pack and three of his friends, Dana Simmons, Clarence Fuller, and Leonard James, went to a local park to watch a football game. Shortly after Pack and his friends returned to Pack's apartment, Officers Moore and Price drove through an intersection near Pack's apartment in an unmarked police vehicle and heard an unidentified individual yell "five-o"--a term used to identify the presence of police officers. Sensing that some type of criminal activity was occurring, Moore and Price sought to uncover what motivated someone to identify them as police officers. The officers positioned their vehicle in a nearby alley and observed what they believed to be a narcotics exchange outside Pack's apartment. After maneuvering onto the street in front of Pack's apartment, Moore and Price got out of their vehicle with their weapons drawn to confront Pack and his friends.
 
 
 4
 The parties offer contrasting versions of what happened next. Moore and Price claimed that as they approached Pack's apartment building, Pack was leaning against the building and Dana Simmons was seated in Pack's wheelchair. As Moore and Price drew near, they observed Clarence Fuller release a quantity of drugs from his hands and attempt to cover it with his foot. Moore recovered the drugs, patted down Fuller, and placed him under arrest. Once the officers had detained Fuller, Price attempted to enter Pack's apartment in order to confront Leonard James, but encountered Pack's dog, a pit bull, chained near the door leading to the entrance of the apartment. Moore and Price eventually handcuffed James and Simmons and placed them along with Fuller into their unmarked police car.
 
 
 5
 During the course of this confrontation, Pack began to yell and swear at the officers. Pack's grandmother, Juanita Hines, leaned out of an upstairs window and observed the situation below. She immediately went outside to the area where Pack and the officers were arguing and attempted to calm Pack. Moore contemplated placing Pack under arrest, but concluded that it would not be worth the effort given Pack's medical conditions and decided to leave Pack in the care of his grandmother.
 
 
 6
 The competing version of events stands in stark contrast to the description of the relatively innocuous encounter presented by the police officers at trial. According to the testimony of Simmons, Pack's dog began barking upon the arrival of the two police officers. At that point, Moore allegedly threatened to shoot the dog, and an argument ensued between Pack and Moore regarding Moore's threat. Pack remained seated in his wheelchair throughout the confrontation with the police officers and was not standing against the building as Moore testified. While Pack argued with Moore, Simmons and James warned Moore of Pack's serious medical conditions, including his heart problem. In complete disregard of these warnings, Moore struck Pack in his chest while he was seated in his wheelchair, grabbed him out of his wheelchair, and slammed him into a concrete pillar supporting the apartment building.
 
 
 7
 From her second floor apartment, Hines observed Moore holding Pack against the concrete pillar with his legs spread apart. In response to Hines's demand for an explanation, Moore indicated that he was arresting Pack for selling drugs. Not until after Hines convinced Moore to return Pack to his wheelchair and pleaded with Moore not to arrest him due to his medical conditions did Moore agree to leave Pack in her care.
 
 
 8
 While Hines and Moore continued to argue, Carter arrived upon the scene and took her son into their apartment. Carter noticed Pack was extremely upset and crying. He was also having difficulty breathing. Carter attempted to calm her son and asked his brother to set up a video game for the two to play, hoping that this distraction would reduce Pack's anxiety. Several minutes later, Carter heard screams coming from the room where Pack and his brother were playing. Carter returned to the room to find Pack lying on the floor with blood flowing out of his mouth. Attempts at resuscitation failed and, upon the arrival of the paramedics, Pack had no vital signs. Pack was taken to Loretto Hospital, where he was pronounced dead.
 
 B. Proceedings Before the District Court
 
 9
 The parties went to trial before a jury on six counts of an amended complaint and presented their versions of what transpired on the day of Pack's death. Just as the testimony of those present on the day of Pack's death painted two separate and distinct versions of the interaction between Pack and the two officers, so too did the expert testimony offered by both sides regarding the cause of Pack's death. Although both Dr. Tyrone Daniels, Pack's cardiologist and acting Associate Director of the Coronary Care Unit at Cook County Hospital, and Dr. Daniel Fintel, Director of the Coronary Care Unit at Northwestern Memorial Hospital, agreed that the cause of Pack's death was sudden death,[1] they disagreed as to whether the incident with the officers triggered the sudden death in Pack's case. Dr. Daniels testified he was reasonably certain that Pack suffered acute anxiety leading to a reduction in heart function caused by his encounter with the officers; in essence, Pack was scared to death by them. Dr. Fintel, on the other hand, concluded that the duration of time between the incident with the officers and Pack's death was inconsistent with a finding that the encounter with the officers caused Pack's sudden death. In his opinion, because there was no evidence of external or internal bruising, bleeding, trauma, or abrasion indicating physical contact with the police, there must have been some other cause for the cardiac deterioration that caused Pack's death.
 
 
 10
 At the conclusion of the presentation of evidence, the district judge reviewed the proposed jury instructions submitted by the parties. In examining the tendered instructions regarding the definition of proximate cause, the judge concluded that plaintiff's instruction number 18 was an accurate statement of the law and, therefore, would be given to the jury.[2] At the close of the instructions conference, after indicating which of the tendered instructions were to be given and which were refused, the judge assigned responsibility for the preparation of certain of the final instructions to the attorneys for each party. The judge identified the instructions assigned to each party by the number on the tendered copy and then directed the attorneys to bring a clean hard copy and a disk containing each instruction assigned to them to court the following day. However, the judge inadvertently neglected to assign Carter's approved tendered instruction 18 (defining proximate cause) to Carter's attorney for him to prepare.
 
 
 11
 In assigning the instructions to Carter's attorney, the judge stated: "[N]ow ... I'm going to tell you your homework is to come back and give me a disk with clean copies as well as marked copies of the following plaintiff's instructions that will be given: 3, 4, 5, 6, I'm going to go back and pick up 2, which I skipped over, 9, 14 as extensively modified, 15, 16 as--no, I'm sorry, 19 as modified." The judge also identified several instructions that he would draft: "Now let me tell you the ones that I consider to be somewhat open yet, which I'm going to assign to myself; that is the following instructions are still open: Plaintiff's 23, 12." As this exchange clearly demonstrates, plaintiff's tendered instruction 18 was never assigned to Carter's attorney for preparation.
 
 
 12
 Notwithstanding this oversight, Carter's attorney made no objection and did not bring this omission to the judge's attention. Indeed, it is obvious that neither the district judge nor the attorneys for any of the parties recognized the mistake or the difficulty it would later present.
 
 
 13
 The following morning before the attorneys presented their closing arguments to the jury, the instructions assigned to counsel for preparation were consolidated and incorporated as the court's final instructions. Counsel were then provided with a complete set of the instructions the judge intended to give to the jury. At that time, Carter's attorney requested an opportunity to review the jury instructions prior to delivering his closing argument. The judge granted this request and indicated that Carter's attorney should notify him when he was ready to proceed. Again, apparently not noticing the omission, Carter's attorney offered no objection regarding the failure to include the proximate cause definition in the final instructions.
 
 
 14
 The closing argument delivered by Carter's attorney did include a definition of proximate cause. Carter's attorney told the jury that proximate cause "means that it's a sufficient cause, it can be part of the cause, doesn't have to be the whole cause, and that's what it was in this case." At the conclusion of the closing arguments, the court read to the jury its final instructions, and the jury was provided with a written copy of these instructions. No instruction defining proximate cause was read or given to the jury, and Carter's attorney made no objection regarding this omission.
 
 
 15
 Although Judge Ruben Castillo presided over both the trial and the jury instruction conference and delivered the final version of the instructions to the jury, he had to absent himself after jury deliberations began. At Judge Castillo's request, Judge Brian Duff agreed to handle matters through the return of the verdict. Judge Castillo notified the attorneys for both parties that he would be available by telephone if the parties needed to contact him.
 
 
 16
 During the deliberations, the jury detected what neither the court nor the parties had noticed. The jury sent a message to the court containing three questions with the second of the three questions stricken:
 
 
 17
 1. May we have a legal definition of proximate cause?
 
 
 18
 [DELETED: 2.] [DELETED: Can someone be convicted of homicide?]
 
 
 19
 2. Has precedence [sic] been set (case?) where someone has been convicted of scaring someone to death?
 
 
 20
 Upon receiving these questions, Judge Duff assembled the lawyers and informed them of the jury's questions in order to determine an appropriate response. Carter's attorney explained to Judge Duff that the jury had been provided with a definition of proximate cause and requested that the court instruct the jury to refer to the instructions that Judge Castillo provided them. At that time, defendants' counsel also confirmed that the jury had been provided with an instruction defining proximate cause. Unfortunately, even the jury's pointed and direct question on this issue failed to prompt the attorneys for either party or the court to review the instructions. Such a review would have certainly disclosed the absence of a definition of proximate cause.
 
 
 21
 Based on counsel's assurances, Judge Duff proposed to respond to the jury's questions by stating: "You have a definition of proximate cause." Neither side objected to this response. Judge Duff delivered this message to the jury, along with his answer to the jury's second question and an instruction that the jury should continue to deliberate.
 
 
 22
 Later that day, the jury returned its verdict, finding in favor of Carter as to Moore on both the excessive force and the unreasonable seizure claims. It found against Carter as to Price on these claims and as to each defendant on the state law claims for wrongful death and assault and battery. The jury awarded Carter $50,000 in damages on the excessive force claim and $50,000 in damages on the unreasonable seizure claim.
 
 
 23
 At the request of Carter's counsel, Judge Duff polled the jury after they returned their verdict. Once Judge Duff completed the polling, he dismissed the jury. The District Court subsequently entered final judgment on the verdict and dismissed the action against the City of Chicago with prejudice.
 
 
 24
 Carter then filed a motion for a new trial or a partial new trial on damages pursuant to Rule 59(a) of the Federal Rules of Civil Procedure claiming the verdict was the result of jury confusion, the verdicts were inconsistent, and the damage award was inadequate. The District Court denied this motion. Carter also filed a motion and an amended motion pursuant to Rule 60(b) for a new trial on the basis of alleged perjury by Moore and the City of Chicago's failure to tender information pertaining to unrelated complaints lodged against Moore for alleged misconduct. The District Court also denied these motions.
 
 
 25
 Carter filed an appeal with this court alleging, for the first time, that the District Court erred by failing to provide the jury with a definition of proximate cause. In addition to this issue, Carter also requests that we consider whether the jury's verdict was inconsistent and the result of jury compromise.
 
 II. ANALYSIS
 
 26
 A. The District Court's Failure to Instruct the Jury on the
 
 Definition of Proximate Cause
 
 27
 At the outset, we note that Carter is raising the issue of the District Court's failure to provide the jury with a definition of proximate cause for the first time on appeal. Carter failed to raise this issue at any time before the District Court, and issues raised for the first time on appeal are waived. Hoeller v. Eaton Corp., 149 F.3d 621, 625 (7th Cir.1998). As will be discussed below, even if we were to conclude that the issue was somehow preserved for appeal, Carter's arguments are largely without merit.[3]
 
 
 28
 It cannot be disputed that the District Court failed to instruct the jury regarding the definition of proximate cause. Equally beyond dispute is the fact that at no time during the proceedings below did Carter's attorney bring this error to the attention of the District Court. The failure of Carter's attorney to object at trial to the absence of this instruction presents us with two less than ideal alternatives from which to choose: either we apply, albeit in a somewhat rigid and unyielding manner, the standard of waiver required by Rule 51 of the Federal Rules of Civil Procedure to an error inadvertently, yet clearly committed by the District Court, or we look past the demonstration of mutual inattention, and, in effect, reward this inattention by ordering a new trial. We think the former is the only appropriate conclusion we may reach in this case.
 
 
 29
 We held in Deppe v. Tripp that a court of appeals may not treat jury instructions in civil litigation as plain error. 863 F.2d 1356, 1361-62 (7th Cir.1988). Simply stated, "[f]ailure to challenge a jury instruction in a civil case constitutes waiver of that challenge and precludes appellate review." Haley v. Gross, 86 F.3d 630, 644 (7th Cir.1996). This standard is derived directly from the language of Rule 51, which provides that "[n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Fed.R.Civ.P. 51. The lack of an objection to the instructions delivered by the District Court necessarily prevents Carter from arguing on appeal that the failure to include the proximate cause instruction was reversible error.
 
 
 30
 Carter urges us not to apply this rule in the case before us. Carter's argument is based on a line of cases in which we have indicated that a party is not required to make a formal objection to jury instructions in order to preserve the issue for appeal under Rule 51, if that party has made its position clear before the trial court. See, e.g., Hebron v. Touhy, 18 F.3d 421, 424 (7th Cir.1994); Dresser Indus., Inc. v. Gradall Co., 965 F.2d 1442, 1450 (7th Cir.1992). However, the clarity of a party's position alone does not automatically trigger the bar to waiver. Application of the bar to waiver is premised upon the existence of two underlying conditions: (1) a party's position must be made clear to the trial court and (2) any further objection must be unavailing and futile. See Dawson v. New York Life Ins. Co., 135 F.3d 1158, 1165 (7th Cir.1998); Dresser, 965 F.2d at 1450.
 
 
 31
 Although Carter's position before the District Court was clear, she has made absolutely no showing that a timely objection to the District Court's failure to include a definition of proximate cause in its instructions would have been unavailing and futile. Indeed, we must conclude that the opposite is true. The parties did not seriously contest the definition of proximate cause that the District Court decided to deliver to the jury. For this reason, there can be no doubt that an objection alerting the District Court to its miscue would have allowed for a timely resolution of this matter.
 
 
 32
 While the failure of Carter's counsel to recognize the court's omission is understandable--given the natural pressures encountered in the preparation of final instructions--the responsibility to preserve an issue on appeal remains with a party's attorney. The outcome we reach today is necessary to ensure the availability of a high level of justice to all litigants:
 
 
 33
 A litigant who wants to precipitate or participate in the process of legal evolution must at least draw the subject to the court's attention. Trials are costly. We cannot give multiple trials to litigants who do not attend to their own fortunes, without reducing the quality of justice available to other litigants waiting in the queue for judicial attention.
 
 
 34
 Williams v. Boles, 841 F.2d 181, 184 (7th Cir.1988). It would also be inequitable to force the non-erring parties in this case to incur the expense of a new trial occasioned by their opponent's error. See Deppe, 863 F.2d at 1361. The foregoing considerations lead us to the inevitable conclusion that Carter has waived this issue for appellate review.
 
 
 35
 Trial judges have at their disposal numerous methods for developing, reviewing, and producing jury instructions. There are also a variety of methods used by judges to insure objections to instructions or the failure to instruct are preserved for appeal. When considering which methods to employ, it is of paramount importance that fairness and clarity are not sacrificed for the sake of efficiency and expediency in a particular case.
 
 
 36
 With these considerations in mind, we note that the process relied upon by the District Court in this case was not inherently flawed. However, the waiver of the issue of the failure of the court to define proximate cause as requested by Carter could have been avoided through the use of a simpler procedure instituted in a number of district courts. While accepting the language of the tendered instructions and using this language as the court's own, a refusal on the record of all tendered instructions would avoid the waiver problem encountered here. Additionally, a joint review of the complete finalized set of instructions by counsel for both parties and the court would also have reduced the likelihood that the omission would have gone undetected.
 
 B. The Consistency of the Jury's Verdict
 
 37
 Carter also contends that the District Court erred by failing to grant her motion for a new trial. Carter argues that a new trial was warranted because the verdict rendered by the jury was inconsistent and the result of impermissible jury compromise. We initially turn to Carter's contention that the jury's verdict was inconsistent. According to Carter, the inconsistency of the verdict is reflected in two ways. First, Carter claims that a finding of liability with respect to Moore on the federal claims of excessive force and unreasonable seizure cannot be reconciled with the jury's failure to find Moore liable on the state claims of wrongful death and tortious assault and battery. Second, she submits that the amount of damages awarded by the jury is inconsistent with a finding of liability on the federal claims.
 
 1. The Jury's Determination of Liability
 
 38
 Carter bears a particularly heavy burden to succeed in her argument that the District Court erred by failing to grant her motion for a new trial on the ground that the verdict was inconsistent. "Our review of a district court's denial of a post-trial motion for a new trial is deferential." American Nat'l Bank & Trust Co. of Chicago v. Regional Transp. Auth., 125 F.3d 420, 431 (7th Cir.1997). As we have explained, "[a] new trial may be granted only if the verdict is against the clear weight of the evidence, and we will reverse the district judge's decision only where there is a clear abuse of discretion." M.T. Bonk Co. v. Milton Bradley Co., 945 F.2d 1404, 1407 (7th Cir.1991); see also EEOC v. Century Broad. Corp., 957 F.2d 1446, 1460 (7th Cir.1992). "[W]e will not set aside a jury verdict if a reasonable basis exists in the record to support that verdict." M.T. Bonk, 945 F.2d at 1407. The evidence must be viewed in the light most favorable to the prevailing party and issues of credibility and weight of evidence are within the purview of the jury. Id.
 
 
 39
 Before turning to the merits of this claim, we must first address the issue of whether Carter waived her right to a new trial by failing to make a contemporaneous objection to the inconsistency of the verdict at the time the verdict was rendered by the jury. Although many circuits have concluded that the failure to object to an inconsistent general verdict and to move for resubmission of the case to the jury prior to the jury's discharge constitutes a waiver of such an objection, see, e.g., Oja v. Howmedica, Inc., 111 F.3d 782, 790 (10th Cir.1997); Jacobs Mfg. Co. v. Sam Brown Co., 19 F.3d 1259, 1266 (8th Cir.1994); Lavoie v. Pacific Press & Shear Co., 975 F.2d 48, 54 (2d Cir.1992), we have never specifically endorsed such a view, see, e.g., Will v. Comprehensive Accounting Corp., 776 F.2d 665, 678 n. 6 (7th Cir.1985) (noting that the question of waiver with respect to inconsistent general verdicts remains open); but see Timm v. Progressive Steel Treating, Inc., 137 F.3d 1008, 1010 (7th Cir.1998) (stating that "if the [inconsistent] verdicts cannot be reconciled, the whole case must be retried.... If inconsistency escapes notice until after the jury has disbanded, the proper thing to do is to hold a new trial."); Gordon v. Degelmann, 29 F.3d 295, 298-99 (7th Cir.1994) ("If the problem [of inconsistent verdicts] is not caught before the jury disbands (and no one noticed this conflict until post-trial motions), the proper thing to do is to hold a new trial with respect to all affected parties.").[4] While we remark in passing that the requirement of a contemporaneous objection to inconsistent general verdicts certainly serves the interests of finality and efficient use of scarce judicial resources, as well as the interest of eliminating the risk of strategic abuse by litigants, see Strauss v. Stratojac Corp., 810 F.2d 679, 683 (7th Cir.1987), we need not determine whether the failure to make such an objection constitutes a definitive waiver.[5] Even if Carter raised a contemporaneous objection to the jury's verdict, the verdict is not inconsistent, and Carter's position on this issue is without merit.
 
 
 40
 A comparison between the state of mind required for the jury to find Moore and Price liable on the state and federal claims aptly demonstrates that a finding of liability on the federal claims did not necessarily mandate a finding of liability on the state claims. While the federal claims of excessive force and unreasonable seizure required the jury to ascertain whether the officers acted in an objectively reasonable manner, the state claims of tortious assault and battery and wrongful death required proof that the officers acted willfully and wantonly in their treatment of Pack.
 
 
 41
 The instructions provided to the jury exemplify this distinction. The District Court instructed the jury that in order to find the officers liable on the claims of excessive force and unreasonable seizure, the officers' use of force must have exceeded the degree of force that a reasonably prudent officer would have used in the encounter with Pack, and, if there was a seizure of Pack, the seizure must have been unreasonable. The District Court defined the reasonableness inquiry as being an objective one--whether the officers' actions were objectively reasonable in light of the facts and circumstances confronting them without regard to their underlying intent or motivation. The instructions on these issues directly quote language found in Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In Graham, the Supreme Court discussed the standard for assessing liability on claims of excessive force and unreasonable seizure in the context of the Fourth Amendment.[6] See also Frazell v. Flanigan, 102 F.3d 877, 882 (7th Cir.1996) ("Claims that a law enforcement officer used excessive force in the course of an arrest, investigatory stop, or other seizure are analyzed under the Fourth Amendment's objective reasonableness standard ....").
 
 
 42
 In contrast, the District Court instructed the jury that the state law claim of tortious assault and battery and the claim of wrongful death required proof that the officers' conduct with respect to Pack was willful and wanton. We find nothing in error with this instruction; it is a correct statement of Illinois law. The requirement that the officers' conduct be willful and wanton is derived from the statutory exception provided by section 2-202 of the Illinois Local Government and Local Governmental Employee's Tort Immunity Act ("the Act"), which entitles local government employees to immunity from tort liability in the "execution or enforcement of any law" unless their conduct is "willful and wanton." 745 Ill. Comp. Stat. 10/2-202 (West 1993); see also Doe v. Calumet City, 161 Ill.2d 374, 204 Ill.Dec. 274, 641 N.E.2d 498, 505 (Ill.1994).
 
 
 43
 The Act defines willful and wanton conduct as "a course of action which shows an actual or deliberate intention to cause harm, or if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 Ill. Comp. Stat. 10/1-210 (West 1993). Willful and wanton conduct consists of more than mere inadvertence, incompetence, or unskillfulness. See Moran v. City of Chicago, 286 Ill.App.3d 746, 222 Ill.Dec. 112, 676 N.E.2d 1316, 1323 (Ill.App.Ct.1997). A person engages in willful and wanton conduct when he ignores known or plainly observable dangerous conditions and does something that will naturally and probably result in injury to another. See Medina v. City of Chicago, 238 Ill.App.3d 385, 179 Ill.Dec. 658, 606 N.E.2d 490, 496 (Ill.App.Ct.1992). The Act does not require willful and wanton conduct to be an intentional act; rather, it may be an act committed under circumstances exhibiting a reckless disregard for the safety of others. See id. Whether conduct is willful and wanton is ultimately a question of fact for the jury. See Doe, 204 Ill.Dec. 274, 641 N.E.2d at 506.
 
 
 44
 In light of the different standards required to hold Moore and Price liable on the federal and state claims, the question before us ultimately can be reduced to whether a jury could possibly conclude that the officers' conduct was unreasonable without concluding their conduct was willful and wanton. We believe this would be a permissible conclusion for the jury to reach.
 
 
 45
 While a defendant's conduct may be both "unreasonable" and "willful and wanton," these words are not interchangeable. Indeed, although a litigant could soundly argue that willful and wanton conduct should be considered unreasonable, the inverse is not necessarily true. It is entirely possible that unreasonable conduct may not rise to the level of willful and wanton conduct. The case before us illustrates how such a conclusion could be reached by a jury.
 
 
 46
 At trial, the parties presented the jury with conflicting versions of Moore's conduct during the events leading up to Pack's death. Given the inconsistencies among the evidence and testimony presented to the jury, it was certainly within the province of the jury "to parse the facts, to weigh the credibility of each witness and to disregard the testimony" of witnesses it found to be less credible or not worthy of credence. Robinson v. Burlington N. R.R. Co., 131 F.3d 648, 656 (7th Cir.1997); see also Groom v. Days Inn of Am., Inc., 62 F.3d 204, 207 (7th Cir.1995). The parties presented the jury with testimony permitting it to reach the conclusion that Moore's conduct, while unreasonable, was not willful and wanton. Moore testified that he and Price approached Pack and his friends because the officers suspected they were involved in distributing narcotics. Moore also testified that during the encounter with Pack, he refrained from punching or physically abusing Pack. At trial, evidence corroborated this testimony by demonstrating that Pack did not exhibit any internal or external abrasions or bruises suggesting he had sustained a blow to the chest. It would have certainly been reasonable for the jury to have credited this testimony and to have concluded that Moore did not deliberately intend to harm Pack, nor did he display an utter indifference to or a conscious or reckless disregard for Pack's safety.
 
 
 47
 Concomitantly, it would have been reasonable for the jury to conclude that Moore possessed no objectively reasonable basis for searching Pack and, therefore, that his encounter with Pack constituted an unreasonable seizure. Similarly, the jury could have concluded that Moore used unreasonable force while searching Pack. These conclusions would have been consistent with the District Court's jury instructions, which were based squarely upon standards that have been announced by the Supreme Court. See Graham, 490 U.S. at 397, 109 S.Ct. 1865 (stating that when considering claims of excessive force, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation"); Brown, 443 U.S. at 50-51, 99 S.Ct. 2637 ("Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concern served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty."). Neither of these conclusions would have required the jury to conclude also that Moore engaged in willful and wanton conduct. This plausible explanation for the jury's verdict precludes reversal on the basis that the jury's determinations of liability were inconsistent.
 
 2. The Jury's Award of Damages
 
 48
 Carter's claim that the jury's liability determinations were inconsistent with the amount of damages awarded is also without merit. As the District Court recognized, Carter is arguing, in essence, that the damages awarded by the jury are insufficient. As we have stated, once a jury has returned a verdict, a court may grant a motion for a new trial only when the verdict is against the clear weight of the evidence. M.T. Bonk, 945 F.2d at 1407. "We view damages evidence in the light most favorable to the verdict," Roggow v. Mineral Processing Corp., 894 F.2d 246, 249 (7th Cir.1990), and will permit the verdict to stand "unless there [is] no rational connection between the evidence on damages and the verdict," Lippo v. Mobil Oil Corp., 776 F.2d 706, 716 (7th Cir.1985) (quoting Abernathy v. Superior Hardwoods, Inc., 704 F.2d 963, 971 (7th Cir.1983)); see also Mercado v. Ahmed, 974 F.2d 863, 866 (7th Cir.1992); Rosario v. Livaditis, 963 F.2d 1013, 1021 (7th Cir.1992).
 
 
 49
 After making a determination on the issue of liability, the jury awarded Carter $50,000 in damages on both the excessive force claim and the unreasonable seizure claim. We cannot conclude that the amount of damages is not rationally connected to the evidence presented at trial or in contravention of the court's instructions regarding the issue of damages. The District Court instructed the jury that damages with respect to the excessive force and unreasonable seizure could be awarded for any pain and suffering and mental anguish that Pack may have suffered as a result of the injury. Evidence adduced at trial suggested that Moore engaged in a shouting match with Pack and threatened to shoot Pack's dog. Carter also presented testimony that Moore knew of Pack's poor health, yet handled Pack roughly while frisking him. While it is obvious that Carter wanted the jury to conclude that Moore caused Pack's death, the jury was not compelled to reach this conclusion on this issue in light of the conflicting evidence presented. Moreover, the jury is entitled to disregard the amount of damages requested by a party, especially when evidence is introduced from which jurors could draw their own conclusions. See Luria Bros. & Co. v. Pielet Bros. Scrap Iron & Metal, Inc., 600 F.2d 103, 115 (7th Cir.1979). Accordingly, it cannot be said that the jury's award of damages is inconsistent with either the evidence presented at trial or the jury's determination of liability.[7]
 
 3. Compromise Verdict
 
 50
 Carter's argument that the jury's verdict resulted from impermissible compromise is substantially undermined by our conclusions that Carter waived her objection to the District Court's failure to instruct the jury on the definition of proximate cause and that the jury's verdict was consistent. Nonetheless, Carter strongly urges us to order a new trial on this basis.
 
 
 51
 A compromise verdict results when jurors resolve their inability to reach a determination with any certainty or unanimity on issues of liability by awarding a party inadequate damages. See Mekdeci v. Merrell Nat'l Lab., 711 F.2d 1510, 1513 (11th Cir.1983); see also National R.R. Passenger Corp. v. Koch Indus., Inc., 701 F.2d 108, 110 (10th Cir.1983) ("A compromise judgment is one reached when the jury, unable to agree on liability, compromises that disagreement and enters a low award of damages."). "However, an insufficient damages verdict, standing alone, does not necessarily indicate a compromise." Mekdeci, 711 F.2d at 1513. Typically, some additional evidence demonstrating that the deficient monetary award resulted from an impermissible compromise is required. Id. We have recognized that a verdict can be considered a result of jury compromise when the verdict is "so grossly inadequate as to compel the conclusion that [it] represented a compromise by the jury on the question of liability and damages." National Fire Ins. Co. of Hartford v. Great Lakes Warehouse Corp., 261 F.2d 35, 37 (7th Cir.1958); see also National R.R. Passenger Corp., 701 F.2d at 110 ("While a grossly inadequate award of damages by itself does not require retrying the liability issue, suspicion should be aroused if the jury awards only nominal damages.").
 
 
 52
 Consideration of several factors may be useful when examining whether a verdict is a result of jury compromise. These factors include "a damages award that is grossly inadequate, a close question of liability, and an odd chronology of jury deliberations." Skinner v. Total Petroleum, Inc., 859 F.2d 1439, 1445-46 (10th Cir.1988); see also Mekdeci, 711 F.2d at 1514 (listing additional factors that may be considered). While these factors certainly may be of some use, the overarching consideration must be whether "the record itself viewed in its entirety ... clearly demonstrate[s] the compromise character of the verdict, otherwise it is not error for the trial judge to refuse to set the verdict aside on this ground." Luria Bros. & Co., 600 F.2d at 115 (quoting Maher v. Isthmian Steamship Co., 253 F.2d 414, 419 (2d Cir.1958)). When a court recognizes that the jury's verdict is a result of impermissible compromise, such a verdict taints the entire proceeding and the proper remedy is a new trial on all issues. See National Fire Ins. Co. of Hartford, 261 F.2d at 38; see also Mekdeci, 711 F.2d at 1514 ("If sufficiently persuasive indicia of a compromise are present, then the issues of liability and damages are inseparable and a complete new trial is necessary.").
 
 
 53
 Viewing the record as a whole, as well as the factors noted, we cannot conclude that the jury arrived at a compromise verdict in this case. Although the parties sharply contested issues of liability and evidence exists that the jury was somewhat confused with respect to the definition of proximate cause, our previous discussion demonstrates there is no indication that the award of damages was inconsistent with the determination of liability reached by the jury or otherwise grossly inadequate. Carter's argument amounts to nothing more than an expression of her dissatisfaction with the damages awarded by the jury.
 
 
 54
 We also do not believe evidence of jury confusion should carry the weight such evidence would normally be afforded. Carter should not be permitted to benefit from the existence of jury confusion when her own attorney had a substantial hand in failing to prevent it. Furthermore, the record provides no clear indication that the jury endeavored to explain its verdict or that the jury was deadlocked on any issues before it. See Mekdeci, 711 F.2d at 1515 ("Even more indicative, however, is the fact that the jury attempted to qualify its verdict. The effort to explain their verdict, coupled with the announcement of a deadlock ..., reinforces the notion that the jurors could not reach an agreement on the substantive issues."). In light of the evidence presented to the jury and the circumstances of this case, we are compelled to conclude that alternative explanations for the amount of the damages awarded by the jury exist. We find no abuse of the District Court's discretion in its refusal to order a new trial based on Carter's contention that the verdict was a result of impermissible jury compromise.
 
 III. CONCLUSION
 
 55
 Based upon a full examination of the proceedings below, it is our conclusion that Carter waived her objection to the District Court's failure to instruct the jury on the definition of proximate cause and that the jury's verdict was neither inconsistent nor a result of impermissible compromise. Therefore, the judgment of the District Court is AFFIRMED.
 
 
 
 [1]
 Both Dr. Daniels and Dr. Fintel explained that sudden death is a medical term used to describe death resulting from abnormalities in heart rhythms
 
 
 [2]
 Plaintiff's instruction number 18 read: "When I use the expression 'proximate cause,' I mean any cause which, in natural or probable sequence, produced the injury complained of. It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury." In accepting this instruction as tendered by Carter's attorney, the judge stated: "I will certainly give Plaintiff's Proposed Jury Instruction No. 18, which is an accurate statement of the law; and in view of that, I will refuse Defendants' [proximate cause instruction]."
 
 
 [3]
 A review of the record demonstrates that Carter apparently did not realize the District Court's failure to provide the jury with a definition of proximate cause until after the transcript of the proceedings was completed. By the time this discovery was made, Carter had filed a notice of appeal in this case, thereby precluding her from pursuing this issue before the District Court. For this reason, we believe it is appropriate for us to address the arguments she presents
 
 
 [4]
 When the jury returns a general verdict as opposed to a special verdict, the jury has simply determined which party prevails and, if the prevailing party is entitled to damages, the amount of damages to be awarded. See Turyna v. Martam Constr. Co., 83 F.3d 178, 181 (7th Cir.1996). In contrast to the general verdict, a district court may require the jury to return a special verdict in the form of a special written finding upon each issue of fact as provided for by Rule 49 of the Federal Rules of Civil Procedure. Rule 49(a) contemplates that a party waives the right to object to an omission of any issue of fact raised by the pleading or by the evidence unless the party demands the submission of this issue to the jury before the jury retires
 
 
 [5]
 We also note that it is doubtful a contemporaneous objection would have served any useful purpose in this case. At the time the jury rendered its verdict, Judge Duff could not have possessed sufficient familiarity with the facts of the case to allow him to rule on any objections to the verdict that might have been raised by the parties
 
 
 [6]
 The Supreme Court in Graham considered the standard that should be used to assess an individual's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other seizure of an individual. 490 U.S. at 388, 109 S.Ct. 1865. In Terry v. Ohio, the Supreme Court discussed the standard used in gauging the reasonableness of a particular search or seizure and explained that an objective standard of reasonableness should govern this type of inquiry as well. 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("[I]t is imperative that the facts be judged against an objective standard."); see also Brown v. Texas, 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) (reiterating this standard)
 
 
 [7]
 Carter claims that this line of reasoning is flawed because "the only count where the plaintiff sought and argued for any damages other than death was the state survival action, in which the jury found for the defendants." However, a review of the record clearly indicates that the District Court instructed the jury that it could award damages for injuries other than death suffered by Pack: "With respect to plaintiff's excessive force and unlawful seizure claims, you may award damages for any pain and suffering and mental anguish that the plaintiff's decedent experienced as a proximate result of the incident."