# In the
# United States Court of Appeals
## For the Seventh Circuit

---

No. 05-1035

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOYCE KAY OGLE,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Southern District of Illinois.
No. 00 CR 30176 WDS—**William D. Stiehl**, *Judge.*

---

SUBMITTED APRIL 11, 2005—DECIDED OCTOBER 5, 2005

---

Before COFFEY, EASTERBROOK, and KANNE, *Circuit Judges.*

COFFEY, *Circuit Judge.* On March 22, 2002, Joyce Kay Ogle and Alonzo Suggs were each convicted of conspiracy to possess, with the intent to distribute, at least five kilograms of cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1) and 18 U.S.C. § 2.[1] Ogle and Suggs appealed. We affirmed both

---

[1] Ogle was subsequently sentenced to 120 months of imprisonment with five years of supervised release to follow and fined $750.00. Suggs was also convicted of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) and given sentences of 300 months and 120 months to run concurrently with 10 years

(continued...)

convictions in an Order dated February 14, 2003. In doing so we held that Ogle and Suggs were not entitled to a jury instruction on multiple conspiracies because only one, uninterrupted conspiracy existed and had been presented at trial—the one charged. *See United States v. Suggs*, 59 Fed. Appx. 818, 818-20 (7th Cir. 2003). In addition, we concluded that even if evidence of an uncharged conspiracy was admitted in error, that error would have been harmless due to the wealth of evidence supporting a conviction on the conspiracy set forth in the indictment. *See id.* at 820.

Shortly thereafter, Ogle filed a motion *pro se* with the district court requesting a new trial based on what she alleged was "newly discovered evidence" pursuant to FED. R. CRIM. P. 33(b)(2). The district court denied her motion, finding that Ogle had failed to establish the requisite grounds for a new trial as set forth in *United States v. Mitrione*, 357 F.3d 712, 718 (7th Cir. 2004). We affirm.

---

[1] (...continued)
of supervised release to follow and fined $2,000.00.

In addition, prior to trial, co-conspirator John Ellebracht pled guilty to one count of conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1) and 18 U.S.C. § 2. In conjunction with his plea agreement, Ellebracht agreed to cooperate fully with the government in their prosecution of Suggs and Ogle. In return, the government granted Ellebracht immunity from prosecution for any other crimes arising out of the drug conspiracy known by the government at that time or that might become known as a result of his cooperation. In addition, the government also agreed to recommend a sentence at the low end of the sentencing guidelines range determined by the trial judge at sentencing. Ellebracht was eventually sentenced to 70 months to be followed by three years of supervised release and fined $500.00.

## I. Background

Between March 24, 2000 and July 18, 2000, federal authorities arrested three individuals, Marico Bratcher, Stacy Wilkins and Kevin Wren for possession of varying amounts of cocaine. With their cooperation, the Federal Bureau of Investigation ("FBI"), in conjunction with the Federal Drug Enforcement Administration ("DEA"), unraveled what was believed to be a drug trafficking conspiracy with Alonzo Suggs acting as ringleader. Suggs' role in the conspiracy was discovered primarily due to the fact that each of the individuals arrested, independent of each other, named him as their primary source for illegal drug purchases.

After interrogating Bratcher, Wilkins, and Wren, authorities also learned that Suggs received shipments of drugs via commercial airline flights. This information proved reliable, for on June 27, 2000, the authorities were informed of a suspicious suitcase inbound from Phoenix, which was later discovered to be a shipment of cocaine being delivered to Suggs. The discovery was made primarily as a result of a routine bag inspection performed at the Sky Harbor Airport in Phoenix, Arizona by Sergeant Robert Hunsich of the Phoenix Police Department. Sergeant Hunsich observed what his training led him to believe was a suspicious suitcase bound for Lambert Field in St. Louis, Missouri. Consistent with protocol, Sergeant Hunsich immediately alerted authorities in St. Louis to the bag's presence and informed them of his belief that it may contain contraband.[2]

---

[2] The Sergeant believed the suspicious luggage was being used to transport drugs based on the following observations: (1) the luggage appeared to be brand new; (2) it had an unusual odor of perfume; (3) it lacked identification tags displaying the owner's name; (4) it was marked as heavier than normal weight; (5) it contained a lock of substantial durability that was most

(continued...)

When the flight arrived in St. Louis, Detective Gary Sodoma of the St. Louis Police Department, Bureau of Drug Enforcement, inspected the luggage with the aid of a drug detection canine. As suspected, the dog alerted the officers to the presence of narcotics. Instead of confiscating the bag immediately, the agents allowed the suitcase to proceed routinely to the baggage claim area where officers observed a man, later identified as John Ellebracht, take possession of the suitcase and attempt to depart the airport.

As Ellebracht proceeded through a security checkpoint with the suitcase, DEA Agent Ed Remspecher confronted him and inquired as to whether he could ask him some questions. Ellebracht, after speaking with the agents, consented to a search of the luggage. While being questioned by Agent Remspecher prior to the suitcase being opened, Ellebracht made it known that he was unaware of the contents of the suitcase and stated that he did not possess the key to open it. Agent Remspecher, after forcing open (manually separating the zipper) the bag, detected a strong odor of marijuana and observed several clear cellophane bundles coated with a "pinkish-red . . . grease." Concluding that the suitcase contained contraband, agents read Ellebracht his Fifth Amendment rights and placed him under arrest for possession of a controlled substance. When the contents of the suitcase were subsequently examined, DEA officers discovered that it contained more than ten kilograms of cocaine and more than seven kilograms of marijuana.

Ellebracht proclaimed to the agents that he was completely unaware that the suitcase contained any drugs and explained that he was merely transporting the bag and

---

[2] (...continued)
unusual for suitcase security; and (6) he could feel bundles of what, based on his experience, he believed to be compressed drugs, particularly marijuana.

its contents on behalf of an individual known to him only as "Lo." In return for his services, "Lo" had allegedly agreed to pay Ellebracht $500. Ellebracht was scheduled to meet "Lo" that evening at a fast food restaurant in St. Louis. When asked to identify the man he knew as "Lo" in a photographic lineup, Ellebracht selected a photograph of Suggs. Ellebracht agreed to cooperate with the agents and attempted, in the presence of the law enforcement officers, to contact Suggs with the telephone number that he (Suggs) had provided.

Ellebracht left numerous messages on Suggs' voice mail. The calls were later returned by Joyce Kay Ogle rather than Suggs. During the conversations that followed, Ellebracht attempted to dissuade Ogle from getting involved telling her "you don't know what's going on" and added, "stay out of this." Yet, Ogle responded, "Oh, I know what's going on." She then told Ellebracht that he would not be able to meet with Suggs until she, meaning Ogle, met with him first. She told him, "something is up John. Until you come talk to me, he's not going to do anything. You might sit there all night." Ogle then notified Ellebracht that she would wait for him at the 1860's Hard Shell Café, a local restaurant in the city of St. Louis.

Later that evening, DEA Agent Sam Zouglas approached Ogle at the Café bar and placed her under arrest. Ogle told Agent Zouglas and Agent Mike Williams that "Lo" had called her and told her to meet Ellebracht at the 1860's Hard Shell Café. Ogle claimed she was instructed by "Lo" to page him when Ellebracht appeared. Ogle agreed to cooperate with the authorities and tried to contact Alonzo Suggs, but was unsuccessful. Ogle was later released on bond.[3]

---

[3]  In early December of 2000, Ogle fled the state of Illinois and, as a result, the court considered her bond forfeited. On December 5,

(continued...)

In October 2000, a grand jury indicted Suggs, Ogle and Ellebracht each on one count of conspiracy to possess cocaine with intent to distribute from March of 1999 "to on or about July 27, 2000."[4] Prior to trial, Ellebracht entered a plea of guilty to the charges in return for a favorable sentencing recommendation from the government and agreed to aid in the prosecution of Suggs and Ogle as well as testify against them at trial.

At trial, Ellebracht testified that Ogle had introduced him to crack cocaine and had recruited him as a courier for Alonzo Suggs. He further stated that Ogle and he had, on several occasions used crack cocaine—some of which he recalled having obtained directly from Suggs. Ellebracht stated that he had smoked crack on an average of twice a

---

[3]  (...continued)
2000, Texas State Trooper Mark Lancaster observed a car in his rear-view mirror that appeared to be following him. Lancaster pulled into an adjacent rest stop, looked into the vehicle, and noticed a woman covering her face. The trooper ran the tags on the vehicle and received a "wanted" message. He pulled the woman over and explained to her the reason for doing so. The woman responded saying that she did not know of any "wanted" person and handed the trooper an Illinois driver's license and birth certificate identifying herself as Melody G. Cummings. Although the identification card came back clear with no warrants, the driver's appearance matched a physical description of the "wanted" person, Joyce Kay Ogle. The officer detained the woman and while en route to a fingerprint specialist, she feigned sickness, claiming to be suffering from flu-like symptoms, including fever and nausea. After the officers obtained her fingerprints, a comparison was then made with Ogle's fingerprints, which lead to a positive identification of the woman as Joyce Kay Ogle.

[4]  A number of other individuals, including Marico Bratcher, Stacy Wilkins and Kevin Wren were also charged with the possession of cocaine with intent to distribute.

week for the last two-and-a-half years. Ellebracht also testified that it was Ogle that had introduced him to Suggs and recruited him to act as a drug courier, contradicting a pre-trial statement he had made earlier denying that Ogle had recruited him. On cross-examination, Ellebracht was thoroughly questioned about the inconsistencies between his pre-trial statement (where he denied Ogle's involvement) and his testimony at trial implicating Ogle. On redirect, however, he insisted that he was now telling the truth and stated that in his previous statements he had attempted to shield Ogle from trouble because he "cared for her" and "didn't want to involve her in what [he] was doing."

A jury subsequently found both Suggs and Ogle guilty of conspiracy to possess with intent to distribute at least five kilograms of cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1). Both defendants appealed and, in an Order dated February 14, 2003, we affirmed both convictions. In our decision, we held that Ogle and Suggs were not entitled to a jury instruction on multiple conspiracies as they contested because, according to the testimony presented, only one, uninterrupted conspiracy existed—the one that was charged. *See Suggs*, 59 Fed. Appx. at 818-20. In addition, we concluded that even if evidence of an uncharged conspiracy were admitted in error, any error would have been harmless due to the overwhelming amount of evidence introduced in support of a conviction on the charged conspiracy. *See id.* at 820.

Shortly thereafter, Ogle filed a *pro se* motion for a new trial with the district court based on what she alleged to be "newly discovered evidence" pursuant to FED. R. CRIM. P. 33(b)(2). The district court denied her motion finding that Ogle had failed to establish the grounds for a new trial as set forth in *Mitrione*, 357 F.3d at 718.

## II. Issues

Ogle's motion for a new trial was drafted *pro se* and, as such, we construe the claims contained therein liberally. *See Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001), *accord Haines v. Kerner*, 404 U.S. 519, 520 (1972). After much thought, and taking into consideration the principles enunciated in *Haines v. Kerner*, we are able to discern two alternative arguments proffered by Ogle as to why she believes that the district judge erred in refusing to grant her a new trial: (a) that the trial court erroneously applied the standard set forth in *United States v. Mitrione*, 357 F.3d 712 (7th Cir. 2004) to her claim that she should be granted a new trial based on her allegation that the government prosecutor knowingly presented false testimony at trial; and (b) that what she characterizes as "newly discovered evidence" entitles her to a new trial pursuant to Fed. R. Crim. P. 33(b)(1). We review a district court's decision denying a motion for a new trial for abuse of discretion only. *See United States v. Westmoreland*, 240 F.3d 618, 636 (7th Cir. 2001) (citing *United States v. Fruth*, 36 F.3d 649, 652 (7th Cir. 1994)).

## III. Analysis

A.   Knowing Presentation of False Testimony

Ogle's first assignment of error is that the district court applied an incorrect analysis to her claim that she was entitled to a new trial based on her allegation that the government knowingly presented false testimony at trial. Specifically, she argues that, during the trial proceedings, the government prosecutor proffered testimony known to be false and, therefore, she is entitled to a new trial without regard to the temporal constraints of FED. R. CRIM. P. 33(b) (7 day time limit to file a motion for a new trial, unless the motion is based on "newly discovered evidence").

For over 75 years, the test which we applied in determining whether a criminal defendant was entitled to a new trial based on the prosecution's introduction of false testimony was predicated on this circuit's decision in *Larrison v. United States*, 24 F.2d 82, 87-88 (7th Cir. 1928). In *United States v. Mitrione*, 357 F.3d 712 (7th Cir. 2004), we overruled the *Larrison* test in favor of a more restrictive "reasonable probability test." *See id.* at 718. In doing so, we announced that, henceforth: "In order to win a new trial based on a claim that a government witness committed perjury, *assuming as in this case that the government did not knowingly present the false testimony*, defendants will have to prove the same things they are required to prove when moving for a new trial for other reasons . . . [and] show that the existence of the perjured testimony (1) came to [the defendant's] knowledge only after trial; (2) could not have been discovered sooner with due diligence; (3) was material; and (4) would probably have led to an acquittal had it not been heard by the jury." *Id.* at 718 (emphasis added) (citing *United States v. Gonzalez*, 93 F.3d 311 (7th Cir. 1996)).

As *Mitrione* suggests, the rule set forth in that case applies only in the absence of the knowing presentation of false testimony. In contrast, where a criminal defendant does allege that the government *knowingly* presented false testimony, however, we remain bound by the standard enunciated by the Supreme Court in *United States v. Agurs*, 427 U.S. 97, 103 (1976). Under the *Agurs* standard, a new trial is warranted when: "1) the State presented perjured testimony; 2) the State knew or should have known of the perjury; and 3) there is some likelihood that the testimony could have affected the verdict." *Martin v. Evans*, 384 F.3d 848, 855 (7th Cir. 2004) (citing *Agurs*, 427 U.S. at 103). In devising this rule, the Supreme Court reasoned that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if

there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103.

However, nothing in *Mitrione*, *Agurs* nor their progeny abrogates the time limit for filing a motion for a new trial pursuant to FED. R. CRIM. P. 33(b)(2), which proscribes that "[a]ny motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 7 days after the verdict or finding of guilty . . . ." Thus, a motion for a new trial filed after the 7-day time limit set forth in Rule 33(b)(2) has elapsed is properly denied—even where a defendant alleges the knowing presentation of false testimony by the government at trial—unless that claim is based on "newly discovered evidence." FED. R. CRIM. P. 33(b)(2)*; see also United States v. Wall*, 389 F.3d 457, 468 (5th Cir. 2004).

Accordingly, whether Ogle claims the government knowingly or unknowingly presented perjurious testimony, she must present sufficient "newly discovered evidence" to establish her claim. Otherwise, her motion for a new trial must fail, for it was lodged with the trial court well after the 7-day time limit contained in FED. R. CRIM. P. 33(b)(2) had elapsed.

B.  Alleged Newly Discovered Evidence of the Prosecution's Knowing Presentation of Perjured Testimony

Ogle claims that the existence of a pre-trial statement signed by Ellebracht, in which he states that Suggs (instead of Ogle herself) met him at a club and asked him to act as a drug courier, establishes that the prosecutor knowingly suborned perjury. It is true that portions of Ellebracht's pre-trial statement are inconsistent with his testimony at trial. For example, at trial Ellebracht, instead of stating that Suggs recruited him as he had done earlier, admitted that Ogle was the one that had actually "recruited " him.

Ellebracht explained the inconsistency on redirect by explaining that he had colored his previous statements to prosecutors because he "cared for" Ogle and "didn't want to involve her" in the situation, i.e., did not want her to go to jail.

Under the circumstances it appears quite clear that instead of being acquiescent in a scheme to defraud the court or suborn perjury at trial, the prosecutor was actually conducting an honest search for the truth while dealing with a less than veracious witness, Ellebracht.[5] What's more, Ogle's attorney had ample opportunity to, and did, vigorously cross-examine Ellebracht concerning the inconsistencies between his pre-trial statements (which did not

---

[5] Ogle makes much of Ellebracht's post-trial statement that the prosecutor "told me I could not say for a fact that you [Ogle] were not involved" and that "[t]he prosacuter [sic] told me I had to answer his questions a serten [sic] way or I would be held in contemp [sic]." However, this is not surprising and certainly does not rise to the level of establishing that the prosecutor suborned perjury. "Witnesses who have had criminal careers often must be forcefully reminded that trial is a time for scrupulous accuracy." *United States v. Torres-Ramirez*, 213 F.3d 978, 980 (7th Cir. 2000). Ogle complains of "coaching," but this is simply a red herring. The record clearly establishes that, instead of attempting "to replace truth with fabrication," the prosecutor was actually doing his best to elicit the truth from Ellebracht. *Id*. It was left to the jury to determine whether to credit Ellebracht's testimony at trial or his prior statements to law enforcement, and from the verdict we can tell the jury found his testimony at trial both credible and incriminating. *See Sarkes Tarzian, Inc. v. U.S. Trust Co. of Fla. Sav. Bank*, 397 F.3d 577, 585 (7th Cir. 2005) (stating that where there are inconsistencies in the testimony and evidence presented at trial "it [is] certainly within the province of the jury to parse the facts, to weigh the credibility of each witness and to disregard the testimony of witnesses it found to be less credible or not worthy of credence.") (quoting *Carter v. Chicago Police Officers*, 165 F.3d 1071, 1081 (7th Cir. 1998)).

implicate Ogle) and his testimony at trial (which did
establish that she was involved in a drug conspiracy). In
any case, inconsistencies in a government witness' testi-
mony *ipso facto* "do not establish the government's knowing
use of false testimony," and certainly do not do so under
circumstances such as those set forth herein. *See United
States v. Griffin*, 194 F.3d 808, 818 (7th Cir. 1999) (quoting
*United States v. Magana*, 118 F.3d 1173, 1191 (7th Cir.
1997), *cert. denied*, 522 U.S. 1139 (1998)).

C.  Newly Discovered Evidence Under the *Mitrione* Stan-
    dard

In the alternative, Ogle argues that she is entitled to
a new trial—or at least an evidentiary hearing—based on
what she characterizes as "newly discovered evidence"
suggesting that Ellebracht perjured himself at trial under
the "reasonable probability test" announced in *Mitrione*. To
support her contention she cites a number of letters
and statements by Ellebracht which she claims establish
that he testified falsely, as well as an affidavit from Suggs
in which he states that Ogle is "as innocent as a babe in the
woods." Suggs Affidavit, February 4, 2004 at 1.

In contrast to her claim that the government knowingly
used false testimony in securing a conviction, which is
analyzed under the *Agurs* test described above, this portion
of Ogle's claim *is* governed by the four-part test we recently
adopted in *Mitrione*. *See Mitrione*, 357 F.3d at 718. The first
element of that test, is that the existence of the perjurious
testimony came to the criminal defendant's knowledge only
*after* trial. *Id*. The problem is that all of the evidence Ogle
points to, *i.e.*, statements suggesting that Ellebracht was
lying, was squarely at issue prior to and at her trial; for
Ellebracht was the government's "star" witness and his
testimony was subject to exhaustive cross-examination. *See
id*.; *Buie v. McAdory*, 341 F.3d 623, 625 (7th Cir. 2003)

(stating that "[t]he tools of the adversary process supply the means to expose [many] testimonial shortcomings" such as a witness who may be lying). In addition, it is apparent that, due to Ellebracht's pre-trial statements and Ogle's knowledge of the charges against her, Ogle was well aware that Ellebracht was going to testify against her at trial as the government's "star" witness. *See, e.g.*, Appellant's Brief at 7 (characterizing Ellebracht as the government's "key witness" based on his pre-trial statements); *see also United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005) (upholding the denial of a new hearing on a Rule 33 motion and using as support the fact that "[t]he evidence in question all pertained to matters that Canova knew would be in issue at trial, even if he did not know the government's exact position on these matters").

Also, as the trial judge correctly noted, nothing in Ellebracht's statements conclusively establishes that he perjured himself. He repeatedly states that he does not "remember" stating certain things at trial and offers that the "prosacuter [sic] told me I had to answer his questions a serten [sic] way or I would be held in contemp [sic]." In addition, as mentioned above, Ellebracht's statements prior to trial were obviously based, in some part, on his feelings for Ogle. This is evidenced by statements made by Ellebracht to Ogle prior to trial, such as: "I'll do whatever it take's [sic] to help you." Letter from Ellebracht to Ogle, June 18, 2001. The courts generally view recantations very skeptically and with suspicion. *See United States v. Griffin*, 84 F.3d 912, 929 (7th Cir. 1996); *United States v. Badger*, 983 F.2d 1443, 1456 (7th Cir. 1993); *United States v. Kamel*, 965 F.2d 484, 494 n.25 (7th Cir. 1992). This is especially true, as in cases such as this, where the witness who is recanting has already received a benefit—in the form of immunity from prosecution or the government's recommendation of a reduced sentence to the trial court in return for testimony given at trial—and in addition has an ongoing

personal relationship with the defendant. For all these reasons, we are convinced that the district court did not commit an error, much less abuse its discretion, in denying Ogle's motion for a new trial pursuant to FED. R. CRIM. P. 33.

Finally, after considering the record and concluding that the district court did not err in denying Ogle's motion for a new trial we are not convinced this is a situation in which an evidentiary hearing would have produced any details adding verisimilitude to the issue and conclude that the district court was likewise justified in foregoing the redundant procedure of ordering such a hearing. *See Torres-Ramirez*, 213 F.3d at 980.

## IV. CONCLUSION

The decision of the district court is

AFFIRMED.

No. 05-1035 15

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*